23CA1816 Peo in Interest of NMR 06-27-2024 COLORADO COURT OF APPEALS Court of Appeals No. 23CA1816 City and County of Denver Juvenile Court No. 22JV142 Honorable Laurie A. Clark, Judge The People of the State of Colorado, Appellee, In the Interest of N.M.R. and A.R.R., Children, and Concerning N.R.R., Appellant. JUDGMENT AFFIRMED Division I Opinion by JUDGE SCHOCK Welling and Berger*, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced June 27, 2024 Kerry C. Tipper, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Appellee Jenna L. Mazzucca, Guardian Ad Litem Lindsey Parlin, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2023. 
1 ¶ 1 N.R.R. (mother) appeals the juvenile court’s judgment terminating her parent-child legal relationship with N.M.R. and A.R.R. (the children). We affirm the judgment. I. Background ¶ 2 In March 2022, Denver Human Services (the Department) filed a petition in dependency and neglect concerning the children — then six years old and eighteen months old, respectively — based on allegations of parental neglect, domestic violence, inadequate care, and concerns about mother’s mental health. The Department had opened a non-court-involved case more than a year earlier, and the concerns that had prompted the Department’s involvement persisted. Among other things, the petition alleged that mother had failed to send N.M.R. to school, appropriately supervise the children, or maintain medical and therapy appointments. The children had also tested positive for methamphetamines. ¶ 3 In July 2022, mother admitted that the children were dependent or neglected through no fault of her own, see section 19-
3-102(1)(e), C.R.S. 2023, and the juvenile court adjudicated the children dependent or neglected. That day, mother filed a “Notice of Americans with Disabilities Act [(ADA)] Applicability,” which stated 
2 that she was “struggling with mental health issues, developmental disabilities, and effects from a traumatic head injury.” Mother did not request any accommodations, however, saying only that “[s]hould [she] require any accommodations or modifications,” her counsel would confer with opposing counsel and file a motion. ¶ 4 A month later, the court adopted a treatment plan for mother that included four components related to substance abuse, domestic violence, mental health concerns, and parenting time. The court said that it “believe[d] that [mother] needs accommodations, I just don’t know what those accommodations are” until a neuropsychological evaluation could be completed. ¶ 5 In February 2023, nearly a year after the petition was filed and six months after the treatment plan was adopted, the Department moved to terminate the parent-child legal relationship between mother and the children. In July 2023, the Department filed an amended motion for termination. After a three-day hearing, the juvenile court granted the Department’s motion in September 2023. II. Reasonable Efforts ¶ 6 Mother contends that the juvenile court erred by concluding that the Department made reasonable efforts to rehabilitate her 
3 because it did not reasonably accommodate her disability in creating the treatment plan and providing services. We disagree. A. Applicable Law and Standard of Review ¶ 7 The juvenile court may terminate a parent-child legal relationship if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate court-approved treatment plan, or such a plan has not been successful; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2023. ¶ 8 In determining whether a parent is unfit, the juvenile court must consider whether the Department made reasonable efforts to rehabilitate the parent. § 19-3-604(2)(h). “Reasonable efforts” means the “exercise of diligence and care.” § 19-1-103(114), C.R.S. 2023. This standard is satisfied by the provision of services in accordance with section 19-3-208, C.R.S. 2023. § 19-1-103(114); People in Interest of C.T.S., 140 P.3d 332, 335 (Colo. App. 2006). Those services include, as necessary and appropriate, screenings, assessments, and individual case plans; home-based family and crisis counseling; information and referral services; family time 
4 services; and placement services. § 19-3-208(2)(b). The services must be “appropriate to support the parent’s treatment plan.” People in Interest of S.N-V., 300 P.3d 911, 915 (Colo. App. 2011). ¶ 9 When a parent has a qualifying disability under the ADA, the Department and the juvenile court “must account for and, if possible, make reasonable accommodations for the parent’s disability when devising a treatment plan and providing rehabilitative services.” People in Interest of S.K., 2019 COA 36, ¶ 34; see also § 19-3-208(2)(g) (requiring services to comply with the ADA). And in assessing the reasonableness of the Department’s efforts, the juvenile court must consider whether reasonable accommodations were made. S.K., ¶ 34. What is reasonable will vary “based on the child’s health and safety needs, the nature of the parent’s disability, and the available resources.” Id. at ¶ 39. ¶ 10 Whether the Department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. People in Interest of A.S.L., 2022 COA 146, ¶ 8. We review the juvenile court’s factual findings for clear error but review de novo its legal determination, based on those findings, as to whether the Department satisfied its reasonable efforts obligation. Id. 
5 B. Application ¶ 11 Mother contends that the Department failed to reasonably accommodate her cognitive disability by (1) failing to tailor her treatment plan to her individualized needs and (2) failing to provide the services necessary to help her comply with the treatment plan. ¶ 12 Initially, we note that mother never requested any accommodations for her disability.
1 In her ADA notice, mother said that if she needed any accommodations, she would “confer with counsel and motion the court.” She did not do so. That omission undermines her argument that the Department acted unreasonably by not identifying and providing such accommodations. See People in Interest of S.Z.S., 2022 COA 133, ¶ 16; S.K., ¶ 21 (“[T]he parent should . . . identify any modifications that he or she believes are necessary to accommodate the disability.”). Indeed, the juvenile court noted that if mother had requested specific accommodations, it would have expected the Department to implement them, but her failure to do so left the Department to “guess and improvise.” 1 The caseworker testified that the only accommodation mother requested throughout the life of the case was to have family time in a park closer to her to make transportation easier. 
6 ¶ 13 In any event, we agree with the juvenile court’s conclusion that the Department made reasonable efforts to rehabilitate mother, including by making reasonable accommodations for her disability. 1. Treatment Plan ¶ 14 To the extent mother challenges her treatment plan, the juvenile court found that the plan was properly “designed to address the concerns raised in the Petition.” In adopting the plan, the court noted that any modifications or accommodations would need to be based on the results of a neuropsychological evaluation. But mother never completed that evaluation because she did not complete the urinalysis testing that was a necessary prerequisite. ¶ 15 Moreover, the juvenile court found — at the dispositional hearing and in its termination order — that the Department had been unable to involve mother in developing the treatment plan because of difficulties in maintaining consistent contact with her. In particular, the caseworker testified that, over the course of the case, mother had sixteen or seventeen different phone numbers and took several weeks to respond to messages and other attempts to contact her. While mother cites her endorsed expert’s testimony that the treatment plan was not “attainable,” the juvenile court 
7 noted that the expert “offered no suggestions or solutions on how [the caseworker] could have included [mother] in the development of the treatment [plan] when [the caseworker] had no ability to reach [mother].” Mother offers no such suggestions on appeal either. ¶ 16 The appropriateness of a treatment plan — as distinct from the reasonableness of the efforts to implement that plan — must be assessed in light of the facts existing at the time of the plan’s approval. People in Interest of A.N-B., 2019 COA 46, ¶¶ 25-26. Given the information the juvenile court had at the time of the treatment plan’s approval, the court did not abuse its discretion by concluding the plan was appropriate, even if ultimately unsuccessful. People in Interest of M.W., 2022 COA 72, ¶ 32 (noting juvenile court’s discretion to formulate a treatment plan); People in Interest of M.M., 726 P.2d 1108, 1121 (Colo. 1986) (explaining that a plan is not inappropriate just because it is unsuccessful). 2. Provision of Services ¶ 17 The record also supports the juvenile court’s conclusion that, despite not having the results of the neuropsychological evaluation to guide her, the caseworker “implemented accommodations in her interactions with [mother] and requested other providers do the 
8 same.” The caseworker testified that she “work[ed] on this case . . . differently knowing [mother’s] vulnerabilities.” She spoke with mother about “what she felt her challenges were and . . . tr[ied] to work with her on how we could deal with [those challenges].” ¶ 18 For example, the caseworker testified that she used simple language, repeated herself, wrote things down, made lists, repeatedly provided mother necessary phone numbers, and attempted to “keep it simple,” never giving mother more than two to three tasks at a time to avoid overwhelming her. She also made reminder calls, provided notebooks and calendars, went to mother’s residence, sought out other addresses where mother could be found, left messages at a day shelter mother frequented, and scheduled meetings “out in the community . . . offering to meet [mother] wherever she was.” The caseworker further testified that, given mother’s cognitive challenges, she sought to “minimize the number of providers” and “ensure that [mother] has, as much as possible, a one-stop shop for everything that she might need.” ¶ 19 Mother asserts that the Department should have done more — by helping her make appointments, providing transportation, providing “hands on education and interactive services,” and 
9 providing a parenting coach. But mother’s failure to engage and maintain consistent contact with the caseworker and other providers impeded much of this additional assistance. ¶ 20 The caseworker testified that she made a referral for a therapeutic life skills worker, who could have helped mother with remembering appointments, finding transportation, filling out paperwork, and making phone calls. The life skills worker attempted to work with mother for five months — longer than is typical — but was unable to maintain sufficient contact with mother to assist her. The caseworker also testified that she offered to provide mother transportation assistance, but mother refused to give her an address to set it up. And the caseworker tried for several months before the court-involved case to get mother to sign a release so she could help arrange services with mother’s preferred mental health provider, but mother would not sign the release. ¶ 21 Mother cites her expert’s testimony that the Department did not adequately account for her history of trauma when identifying providers. But the caseworker testified that the Department “always sought out trauma-informed providers.” She further testified that she provided referrals to comprehensive community 
10 health organizations specifically as a result of mother’s trauma history and the impact of her head injuries. She also spoke with providers to “provide context” regarding mother’s traumatic head injury and history of trauma, explaining mother’s struggles and “some of the trauma symptoms” the caseworker had observed. ¶ 22 Mother also challenges the timing of the Department’s referrals for neuropsychological and substance use evaluations, measuring the delays from the dates of the Department’s initial involvement and the filing of the petition. But the Department placed a referral for a neuropsychological assessment the same month the dispositional order was entered and the treatment plan was adopted. As noted above, that evaluation could not occur because mother did not complete the urinalysis tests required by the provider to complete the evaluation. The caseworker scheduled those tests but could not consistently reach mother to get her to complete them. The caseworker made a second neuropsychological referral six months later, but again, the provider said it did not have sufficient information about mother’s substance use to proceed. Nevertheless, the caseworker testified that she “never stopped attempting to help get [mother] into mental health treatment.” 
11 ¶ 23 The caseworker made the referral for a substance use evaluation in December 2022 — four months after the entry of the dispositional order. And she testified that she provided mother with information about that evaluation every time they spoke, sometimes at mother’s request. But mother never completed that evaluation either. See C.T.S., 140 P.3d at 333 (“The parent is responsible for assuring compliance with and success of the treatment plan.”). ¶ 24 The juvenile court also highlighted the caseworker’s extensive efforts to contact mother and engage her in rehabilitative efforts more generally. When the caseworker could not reach mother by phone, she went to mother’s home. When mother was no longer living in her apartment, the caseworker looked for her at the day shelter she frequented and left messages there and at another facility where mother would go to obtain community services. ¶ 25 Based on this evidence, the juvenile court found that the caseworker “exerted extraordinary efforts to accommodate [mother’s] lack of reliable communication, lack of transportation, lack of housing, and unstable mental health” but that those efforts were unsuccessful through no fault of the Department. Indeed, the 
12 court found, with record support, that mother was “less stable” at the time of the termination than when the petition was filed. ¶ 26 Thus, taking into account all of the circumstances, we agree with the juvenile court that the Department made reasonable efforts to rehabilitate mother and accommodate her disability. While those efforts were ultimately unsuccessful, “the ADA does not restrict the [juvenile] court’s authority to terminate parental rights when the parent, even on the basis of a disability, is unable to meet his or her child’s needs.” People in Interest of C.Z., 2015 COA 87, ¶ 17. III. Less Drastic Alternatives ¶ 27 Mother next argues that the juvenile court erred by finding there was no less drastic alternative to termination. Mother does not identify any specific alternative, nor did she do so below. But she contends that the Department did not conduct a diligent search for relatives who could have served as placement options under an allocation of parental responsibilities (APR). Because the record supports the juvenile court’s finding to the contrary, we disagree. A. Applicable Law and Standard of Review ¶ 28 Before terminating parental rights, the juvenile court must consider and eliminate less drastic alternatives to termination. 
13 People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 19. In doing so, the court must “give primary consideration to the child’s physical, mental, and emotional needs.” Id. at ¶ 20. Thus, the court may consider, among other things, whether an ongoing relationship with the parent would be beneficial or detrimental to the child and whether an arrangement other than termination would provide the child with adequate permanency or otherwise meet the child’s needs. People in Interest of A.R., 2012 COA 195M, ¶¶ 38, 41. ¶ 29 To that end, the Department must evaluate a reasonable number of potential placement options identified by the parent. People in Interest of D.B-J., 89 P.3d 530, 532 (Colo. App. 2004). But it “is not responsible for ferreting out and investigating relatives who have not been identified as placement alternatives.” People in Interest of M.T., 121 P.3d 309, 314 (Colo. App. 2005); see also People in Interest of Z.P., 167 P.3d 211, 215 (Colo. App. 2007) (noting that a department has “no obligation to independently identify and evaluate other possible placement alternatives”). ¶ 30 A less drastic alternative is not viable simply because it is “adequate.” A.M., ¶ 27. Instead, it must be in the child’s best interests. Id. Thus, if the court considers less drastic alternatives 
14 but finds that termination is in the child’s best interests, it must reject the alternatives and order termination. Id. at ¶ 32. And we must affirm that decision if the court’s findings are supported by the record. People in Interest of B.H., 2021 CO 39, ¶ 80. B. Application ¶ 31 The juvenile court found that there was no less drastic alternative to termination and that all known possible alternatives had been adequately explored. More specifically, it found that the Department had conducted a diligent search for all known relatives and kin but that (1) mother could provide only limited information for the people she suggested; (2) mother could provide only a first name and a nonworking phone number for a person she identified as the children’s godfather; and (3) the children’s maternal aunt did not commit to moving forward with the required placement process. ¶ 32 The court also found that it was in the children’s best interest to have the permanency of adoption, particularly given the children’s young age. See § 19-3-702(5)(c), C.R.S. 2023 (requiring a child under six years of age to be placed in a permanent home “as expeditiously as possible”). It noted that the older child, in particular, has special needs relating to his post-traumatic stress 
15 disorder, including the need for constant supervision, structure, consistent cooperation with his therapeutic provider, affection, and assistance with anxiety. Yet the court found that mother was “no closer to addressing the concerns related to [her] ability to provide reasonable parental care” than when the petition was filed. ¶ 33 The record supports the juvenile court’s findings. The caseworker testified that, at the outset of the case, she completed a database search for potential relatives but did not find anyone she could contact. She also spoke with mother on multiple occasions about anyone who might be willing to care for the children, and mother said she had no such support. Although mother indicated that she had family in Colorado, the caseworker testified that she could not find contact information for any family members. ¶ 34 The caseworker also testified about five people mother had mentioned as potential placement options: a sister in Colorado, the children’s godfather, two friends in Texas, and a sister in California. Mother was either unable or unwilling to provide accurate contact information for the first four of those individuals. She provided no contact information for her sister, only a first name and an out-of-
service phone number for the godfather, a Facebook contact for one 
16 of the Texas friends, and no information for the other, saying only that the first friend would be able to provide contact information for the second. The caseworker testified that she reached out to the friend on Facebook Messenger and did not receive a response. ¶ 35 The caseworker did speak with mother’s sister in California and explained the placement process. The sister said that she would need to speak with others in her household and get back to the caseworker as to whether she would be willing to go through with that process. But she did not call the caseworker back. The caseworker then followed up again, and the sister again said she would need to get back to her. Again, the sister did not do so. ¶ 36 The caseworker also testified that she explored as potential placement options the placements for the children’s other siblings, but those individuals were unwilling to accept placement of the children. And she discussed options short of termination with the children’s foster parent, but he was unwilling to accept an APR because of concerns about its impact on him and the children. The caseworker further opined that, even if feasible, an APR was not in the children’s best interest because mother’s inconsistent contact with the children negatively impacted the children’s mental health. 
17 ¶ 37 Ultimately, the caseworker opined that it was in the best interests of the children to terminate mother’s parental rights so the children could be adopted by their foster father. She explained that the children needed permanency and that mother was “less able to meet the children’s needs” at the time of the termination hearing than she was when the case began. The older child’s therapist similarly testified that the child needed consistency to prevent him from regressing to his previous counterproductive behaviors. ¶ 38 Mother points to three things she contends the Department should have done differently: (1) conducting additional database searches; (2) searching records and California databases for other family in California; and (3) investigating mother’s sister in Colorado. But the Department was not required to independently identify potential placement alternatives that mother did not. See Z.P., 167 P.3d at 215. And the record supports the juvenile court’s finding that the Department conducted a diligent search into all placement options mother identified. See D.B-J., 89 P.3d at 532. ¶ 39 Moreover, mother does not explain how the avenues she identifies could have yielded a less drastic alternative to termination — one she still does not identify. First, although the 
18 caseworker did not conduct follow-up database searches, she continued to ask mother about potential placement options, to no avail. Second, the caseworker contacted the only family she knew of in California, and mother does not identify any others. The caseworker explained that California records are not in Colorado’s database, and she did not have access to California’s database. Third, the caseworker did request contact information for mother’s sister in Colorado, but mother did not provide it after saying the sister’s background check would disqualify her. The caseworker also noted that the sister had placed mother and the children at risk of eviction by showing up to their home under the influence and physically attacking mother in front of the children. ¶ 40 Thus, the record supports the juvenile court’s findings that the Department adequately explored all known alternatives to termination, no viable alternative was identified, and termination of mother’s parental rights was in the children’s best interests. See B.H., ¶ 80. We therefore will not disturb that decision. Id. IV. Disposition ¶ 41 The judgment is affirmed. JUDGE WELLING and JUDGE BERGER concur.