2015 COA 87

**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**IN the INTEREST OF C.Z., a Child,**

and

**Concerning J.E.Z. and M.E.Z., Respondents–Appellants.**

**Court of Appeals No. 14CA2453**

Colorado Court of Appeals, Div. I.

Announced June 18, 2015

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S. 2014.

Robert J. Frick, County Attorney, Tomi L. Hanson, Assistant County Attorney, Greeley, Colorado, for Petitioner–Appellee.

Jennifer Clegern, Guardian Ad Litem

Ginger V. Geissinger, Greeley, Colorado, for Respondent–Appellant J.E.Z.

Carrie Ann Lucas, Windsor, Colorado, for Respondent–Appellant M.E.Z.

Opinion by JUDGE TAUBMAN

¶ 1 In this dependency and neglect action, M.E.Z. (mother) and J.E.Z. (father) appeal the trial court's judgment terminating their parent-child legal relationship with C.Z. (the child). We consider, as a matter of first impression, whether the Americans with Disabilities Act (ADA) pre-empts section 19–3–604(1)(b)(I), C.R.S.2014, which authorizes termination based on a finding that no appropriate treatment plan can be devised to address a parent's unfitness caused by mental impairment. We conclude that it does not and affirm the judgment.

## I. Background

¶ 2 In November 2013, the Weld County Department of Human Services (Department) filed a dependency and neglect petition after mother was unwilling to follow through with treatment to address her multiple mental health diagnoses. The Department also asserted that father had been diagnosed with severe depression, and mother and father had previously had their rights terminated as to older children. Approximately one week later, the court granted the Department custody of the child.

¶ 3 Thereafter, the court adjudicated the child dependent and neglected and approved a treatment plan for the parents. The treatment plan required mother and father, among other things, to engage in therapeutic parenting time with the child, complete psychological and parent-child interactional evaluations and follow the evaluator's recommendations, and participate in individual therapy.

¶ 4 However, after receiving the psychological and parent-child interactional evaluations in July 2014, the Department moved to terminate mother's and father's parental rights, asserting that no appropriate treatment plan could be devised to address their alleged unfitness.

¶ 5 Following a contested hearing, the trial court found that no appropriate treatment plan could be devised to address mother's and father's unfitness due to their emotional illnesses, mental illnesses, or mental deficiencies. Accordingly, it terminated the parent-child legal relationship between the child and mother and father.

¶ 6 Mother and father now appeal.

## II. Termination Criteria

¶ 7 A court may terminate parental rights under section 19–3–604(1)(b) if it finds that the child has been adjudicated dependent and neglected and no appropriate treatment plan can be devised to address the parent's unfitness. One basis for unfitness is that the parent has an emotional illness, mental illness, or mental deficiency of such duration or nature as to render the parent unlikely within a reasonable time to be able to care for the child's ongoing physical, mental, and emotional needs and conditions. § 19–3–604(1)(b)(I); *People in Interest of K.D.*, 155 P.3d 634, 638 (Colo.App.2007).

## III. The ADA and Termination of Parental Rights

¶ 8 Mother and father contend that section 19–3–604(1)(b)(I) conflicts with the ADA because it allows the court to terminate parental rights of disabled parents without requiring the Department to provide them with the rehabilitative services that other parents receive. As we understand their argument,

they contend that section 19–3–604(1)(b)(I) is pre-empted by the ADA. We are not persuaded.

■ ¶ 9 Initially, we reject the Department's argument that mother and father failed to preserve the issue for appeal because they "did not present any evidence or object to any evidence as discriminatory or violating the [ADA]." To the contrary, mother and father preserved this issue for review by presenting it to the trial court in closing argument. *See Estate of Keenan v. Colo. State Bank & Trust,* 252 P.3d 539, 548 (Colo. App.2011).

### A. Standard of Review

■ ¶ 10 We will not disturb the trial court's factual findings supporting a termination judgment unless they are so clearly erroneous as to find no support in the record. *People in Interest of A.J.L.,* 243 P.3d 244, 250 (Colo.2010). However, we review de novo whether a state statute is pre-empted by federal law. *See In re Marriage of Anderson,* 252 P.3d 490, 493 (Colo.App.2010).

### B. The ADA

¶ 11 Title II of the ADA, 42 U.S.C. §§ 12131–12134 (2012), prohibits a public entity from discriminating against a "qualified" person with disabilities in the provision or operation of public services, programs, or activities. *Tennessee v. Lane,* 541 U.S. 509, 517, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Specifically, it provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. "Qualified individuals" under the ADA are those individuals with disabilities who can meet a public entity's essential eligibility requirement," if provided reasonable accommodation. 28 C.F.R. § 35.104. A public entity includes any department or agency of a state or local government. 42 U.S.C. § 12131(1)(B).

■ ¶ 12 The ADA was enacted not only to remedy discrimination in the form of intentional exclusion, but also to mandate reasonable modifications to existing policies and to otherwise reasonably accommodate individuals with disabilities. 42 U.S.C. § 12101(a)(5); *Colo. State Bd. of Med. Exam'rs v. Ogin,* 56 P.3d 1233, 1236 (Colo. App.2002). Thus, the ADA imposes an affirmative duty on a public entity to make reasonable accommodations for qualified individuals with disabilities. 28 C.F.R. § 35.130(b)(7) (2014); *Ogin,* 56 P.3d at 1236.

¶ 13 A "qualified individual with a disability" is an

> individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). A disability includes a mental impairment that substantially limits one or more major life activities of the individual. 42 U.S.C. § 12102(1)(A).

¶ 14 It is undisputed that mother's and father's mental impairments, which include borderline intellectual functioning as well as mental illness diagnoses, impede their ability to parent the child. Accordingly, we assume, and the parties do not dispute, that the parents' mental impairments are disabilities under the ADA.

¶ 15 Further, mother and father may be "qualified individuals with a disability" if the Department can provide them reasonable accommodations, as discussed below.

### C. ADA's Applicability

■ ¶ 16 To begin, we address the Department's assertion that the parents' contention can be summarily rejected because the ADA is not a defense to termination of parental rights.

■ ¶ 17 As a division of this court has previously recognized, the ADA does not restrict the trial court's authority to terminate parental rights when the parent, even on the basis of a disability, is unable to meet his or

her child's needs. *People in Interest of T.B.,* 12 P.3d 1221, 1223 (Colo.App.2000). Indeed, a child is entitled to a minimum level of care regardless of the special needs or restricted capabilities of his or her parents. *Id.* at 1223–24. In this sense, the ADA cannot be raised as a defense to termination of parental rights. *Id.* at 1223.

¶ 18 In *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206, 208, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the United States Supreme Court considered whether Title II of the ADA applied to inmates in state prisons. The Court concluded that Title II plainly covered state institutions without any exception that could cast its applicability to prisons into doubt and, thus, it unambiguously extended to state prison inmates. *Id.* at 209, 213, 118 S.Ct. 1952.

¶ 19 Similarly, Title II of the ADA makes no exception for county or state agencies that provide assessments, treatment, and other services to parents through a dependency and neglect proceeding. Several other jurisdictions have recognized that, while the ADA is not a defense to termination of parental rights, it nonetheless governs services that an agency provides to parents before termination. *See Lucy J. v. State, Dep't of Health & Social Servs.,* 244 P.3d 1099, 1115–16 (Alaska 2010) (recognizing that family reunification services are contemplated within Title II of the ADA); *In re Adoption of Gregory,* 434 Mass. 117, 747 N.E.2d 120, 126 (2001) (concluding that the ADA requires the department to accommodate a parent's special needs in its provision of services prior to a termination proceeding); *In re Terry,* 240 Mich.App. 14, 610 N.W.2d 563, 570 (2000) (determining that reunification services must comply with the ADA even though the termination proceeding was not a service or program under the ADA).

¶ 20 Likewise, the Indiana Court of Appeals concluded in dictum that its termi-

nation statute did not conflict with the ADA's reasonable accommodation requirement because the state statute did not require the provision of services before termination. *Stone v. Daviess Cnty. Div. of Children & Family Servs.,* 656 N.E.2d 824, 830 (Ind.Ct. App.1995). However the court observed that if the termination statute required services to be provided to all parents before termination, an ADA violation would provide grounds for attacking a termination judgment. *Id.*

¶ 21 Indeed, at oral argument, the assistant county attorney conceded that the Department, as a public agency, was subject to the ADA and had to include reasonable accommodations and modifications in a treatment plan.[1]

¶ 22 Thus, while Title II of the ADA does not limit the court's authority to terminate a disabled parent's rights when the parent is unable to meet his or her child's needs, it nonetheless applies to the provision of assessments, treatment, and other services that a department provides to parents through a dependency and neglect proceeding prior to the termination hearing. *See* 42 U.S.C. §§ 12131–12132; *see also* Office of the Child's Representative, *Guided Reference in Dependency: An Advocacy Guide for Attorneys in Dependency Proceedings* F64 (n.d.).

¶ 23 Accordingly, we must next determine whether section 19–3–604(1)(b)(I), which authorizes termination without the provision of a treatment plan for a mentally impaired parent, is pre-empted by the ADA.

### D. Pre-emption

¶ 24 Under the pre-emption doctrine, the Supremacy Clause invalidates state laws that interfere with, or are contrary to, federal laws. *Sapp v. El Paso Cnty. Dep't of Human Servs.,* 181 P.3d 1179, 1184 (Colo. App.2008). Pre-emption occurs under three sets of circumstances. *See id.* However, only one type of pre-emption, conflict pre-emption, is at issue here.[2] Conflict pre-emp-

---

1. This concession is further supported by the Colorado Department of Human Services' regulations, which explicitly require that child welfare service programs be administered in compliance with Title II of the ADA. *See* 12 Code Colo. Regs. 2509–7:7.604 (effective Jan. 1, 2015) (for-

merly codified at 12 Code Colo. Regs. 2509–7.000.71).

2. Pre-emption also occurs when (1) Congress explicitly states its intent to pre-empt state law in a federal statute; or (2) a federal statute is so

tion voids a state statute that actually conflicts with a valid federal law. *Id.* However, a conflict will be found only when compliance with both federal and state regulations is a physical impossibility or when the state law stands as an obstacle to the accomplishment and full execution of the purposes and objectives of federal law. *Id.*

¶ 25 While the regulations implementing the ADA require accommodations for individuals with mental impairments, any accommodation must be reasonable. *Wis. Cmty. Servs., Inc. v. City of Milwaukee,* 465 F.3d 737, 752 (7th Cir.2006). What constitutes a reasonable accommodation requires an individualized assessment. *Ogin,* 56 P.3d at 1236. However, the duty to make reasonable accommodations does not require a public entity to fundamentally alter the nature of the services it provides. *Id.*; 28 C.F.R. § 35.130(b)(7). Further, an individual who poses a public safety risk is not a qualified individual with a disability under the ADA when reasonable accommodations will not eliminate the risk. *Ogin,* 56 P.3d at 1236.

¶ 26 Section 19–3–604(1)(b)(I) permits the court to terminate the parental rights of mentally impaired parents without requiring the Department to provide them with treatment plans and, by extension, rehabilitative services that it provides to other parents before termination. Nonetheless, for the reasons set forth below, we conclude that it does not conflict with the ADA's requirement that a public entity make reasonable accommodations for qualified individuals with disabilities.

¶ 27 Contrary to mother's assertion, section 19–3–604(1)(b)(I) does not authorize termination of parental rights solely because a parent has a disability. Rather, it permits a court to terminate parental rights only when the parent is unlikely to be able to meet his or her child's needs and conditions within a reasonable time. Although the parent's inability to care for the child may be caused by a mental impairment, that does not create a

presumption that a parent's mental impairment, in and of itself, justifies termination. *See People in Interest of B.W.,* 626 P.2d 742, 743 (Colo.App.1981) (recognizing that it cannot be presumed that it is in a child's best interests to remove the child from the custody of a parent based solely on the parent's disability).

¶ 28 We are also convinced that section 19–3–604(1)(b)(I) implicitly requires the trial court to consider whether reasonable accommodations can be made to provide rehabilitative services to address the parent's mental impairment and enable the parent to meet the child's needs. *Cf. People in Interest of M.M.,* 726 P.2d 1108, 1122–23 (Colo.1986) (termination of parental rights statute implicitly requires courts to consider and reject less drastic alternatives). Specifically, the court must determine whether an appropriate treatment plan can be devised for the parent. An "appropriate treatment plan" is one that is "reasonably calculated to render the particular [parent] fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs." § 19–1–103(10), C.R.S.2014.

¶ 29 In making this determination, the court must consider whether any rehabilitative services, including mental health services, can be offered to address the particular parent's unfitness—the mental impairment that renders the parent unable to care for the child. *See* § 19–3–208(2)(a)(IV), C.R.S.2014 (requiring that services provided to families be designed to facilitate, if appropriate, the reunification of parents and children). Indeed, if rehabilitative services can be offered to address a parent's mental impairment so that he or she can meet the child's needs within a reasonable time, then termination is not authorized under section 19–3–604(1)(b)(I).

¶ 30 Thus, a finding that no treatment plan can be devised to address a parent's unfitness caused by mental impairment is the

pervasive that it implicitly reflects a congressional intent to occupy an entire field. *Banner Adver., Inc. v. City of Boulder,* 868 P.2d 1077, 1080 (Colo.1994); *see also Brubaker v. Bd. of Cnty. Comm'rs,* 652 P.2d 1050, 1055 (Colo.1982). Title

II of the ADA neither explicitly nor implicitly reflects a congressional intent to occupy the field of child welfare proceedings. Accordingly, only conflict pre-emption applies to our analysis.

equivalent of a determination that no reasonable accommodations can be made to account for the parent's disability under the ADA. *See Lucy J.,* 244 P.3d at 1116 (recognizing that whether reunification services reasonably accommodated a parent's disability is already included within the question of whether reasonable efforts were made to reunite the family).

¶ 31 Although we conclude that a determination that no reasonable accommodations can be made to address the parent's mental impairment is included within the question of whether an appropriate treatment plan can be devised for the parent under section 19–3–604(1)(b)(I), we nonetheless encourage trial courts, when addressing ADA issues, to make express findings as to whether there are reasonable accommodations that can be made to account for the parent's disability.

¶ 32 In determining whether reasonable accommodations can be made to address the parent's disability under the ADA, the court's paramount concern must remain the child's health and safety. *See* § 19–1–103(89). Indeed, the ADA does not protect an individual who, even by virtue of his or her disability, poses a safety risk to others. *See Ogin,* 56 P.3d at 1236; *see also T.B.,* 12 P.3d at 1223–24.

¶ 33 In reaching this holding, we do not intend to suggest that a dependency and neglect proceeding is the appropriate forum to litigate whether the Department has complied with the ADA. *See* § 19–3–502(4), C.R.S.2014 (providing that no counterclaim, cross-claim, or other claim for damages may be asserted by a respondent in a dependency and neglect action). Rather, the ADA's reasonable accommodation requirement should help inform the court's determination as to whether an appropriate treatment plan can be devised to address a parent's unfitness caused by a mental impairment.

¶ 34 Accordingly, we conclude that section 19–3–604(1)(b)(I) does not conflict with the ADA's requirement that a public entity make reasonable accommodations for qualified individuals with disabilities. *See Sapp,* 181 P.3d at 1184.

### E. Application

¶ 35 Here, the trial court did not expressly determine that no reasonable accommodations could be made to account for mother's and father's mental impairments. Nevertheless, it found that no appropriate treatment plan could be devised to address the parents' unfitness because they had chronic and severe mental illnesses which interfered with their ability to provide even minimally competent parental care for the child and rendered them unlikely to do so in a reasonable time. The court also found that uncontroverted evidence established that there was no service available in Colorado to address the parents' particular deficits, and that mother and father did not suggest specific referrals to agencies that could have helped them address their severe mental health problems.

¶ 36 Indeed, mother testified that she did not need any help caring for the child and would not have cooperated with in-home services because it was not a "comfortable setting for [her]."

¶ 37 We conclude that the trial court's findings, which are supported by the record, satisfy the ADA requirement that no reasonable accommodations could be made to enable mother and father to participate in an appropriate treatment plan and rehabilitative services.

### IV. Equal Protection

¶ 38 Father contends that the termination of his parental rights solely on the basis of his mental disability violates his right to equal protection under the Fourteenth Amendment. Specifically, he argues that parents who have mental disabilities are treated differently from parents without a disabilities. We discern no equal protection violation.

¶ 39 Equal protection guarantees that parties who are similarly situated will receive like treatment by the law. *M.M.,* 726 P.2d at 1117. Thus, the threshold inquiry is whether persons who are similarly situated are subjected to disparate treatment. *People in Interest of C.B.,* 740 P.2d 11, 17 (Colo. 1987).

¶ 40 Section 19–3–604(1) sets forth different bases under which the court may terminate the parent-child legal relationship following a child's adjudication as dependent and neglected. *K.D. v. People*, 139 P.3d 695, 700 (Colo.2006). As pertinent here, the court may terminate parental rights under section 19–3–604(1)(b) if it finds that no appropriate treatment plan can be devised to address a parent's unfitness and the unfitness is based on the parent's mental impairment and its duration, long-term confinement, or acts of significant abuse to the child or other children. Alternatively, the court may terminate a parent's rights under section 19–3–604(1)(c) if it finds that (1) the parent has not complied with an appropriate, court-approved treatment plan or the plan was unsuccessful; (2) the parent is unfit; and (3) the parent's conduct or condition is unlikely to change within a reasonable time. *People in Interest of C.H.*, 166 P.3d 288, 289 (Colo.App.2007).

¶ 41 Section 19–3–604(1) differentiates between parents who must be provided with treatment plans before their parental rights may be terminated and those for whom no appropriate treatment plan can be devised. However, this distinction is not based solely on a parent's disability. Rather, it applies to those situations in which clear and convincing evidence establishes that a treatment plan would not succeed because a parent's mental impairment is of such duration that it renders the parent unable to care for a child within a reasonable time. *People in Interest of C.S.M.*, 805 P.2d 1129, 1131 (Colo.App. 1990).

¶ 42 Parents who are unable to meet their children's needs within a reasonable time, whether it is because of a mental impairment or another reason enumerated in section 19–3–604(1)(b), are not similarly situated to parents who have the ability to become fit within a reasonable time. *See* § 19–1–102(1)(b), C.R.S.2014 (stating that one of the purposes of the Children's Code is to preserve and strengthen family ties whenever possible); *see also* § 19–3–208(2)(a)(IV) (indicating that services shall be designed to facilitate, if appropriate, the speedy reunification of a parent with a child who is in out-of-home placement).

¶ 43 In *M.M.*, the Colorado Supreme Court similarly concluded that a statute that required the appointment of a guardian ad litem for a minor parent but not for a parent who was mentally disabled did not violate equal protection. 726 P.2d at 1118. It reasoned that because there were real differences between the respective disabilities and legal incapacities of mentally disabled persons and minors, there was no constitutional requirement that these categories of persons be treated exactly the same way. *Id.* at 1117–18.

¶ 44 Accordingly, we conclude that section 19–3–604(1)(b)(I) did not deprive father of equal protection of the law.

¶ 45 We decline to address father's argument that the termination of his parental rights also violates "Section 504 of the Rehabilitation Act."

¶ 46 C.A.R. 3.4(g)(3)(E) requires that the petition on appeal include a concise statement of the legal issues presented for appeal. The rule specifically states that "general conclusory statements such as 'the trial court's ruling is not supported by the law or the evidence' are not acceptable." C.A.R. 3.4(g)(3)(F) further requires the petition to contain "[s]upporting statutes, case law, or other legal authority for the issues raised, together with a statement of the legal proposition for which the legal authority stands and a concise explanation of its applicability to the issues presented on appeal."

Father's petition on appeal does not comport with C.A.R. 3.4(g)(3)(E) and (F) with respect to his Rehabilitation Act claim. Father does not provide any explanation or discussion of the Rehabilitation Act's applicability to the termination proceedings. Accordingly, we will not address this argument on appeal. *See People in Interest of D.M.*, 186 P.3d 101, 102 (Colo.App.2008), *disapproved of on other grounds, A.L.L. v. People*, 226 P.3d 1054, 1064 n.7 (Colo.2010).

## V. Termination Criteria

¶ 47 Father contends that the trial court erred in finding that no appropriate treatment plan could be devised to address his unfitness. We are not persuaded.

¶ 48 Initially, we reject father's argument that the court was precluded from finding that no appropriate treatment plan could be devised to address his unfitness because it had previously approved a treatment plan for him. Contrary to father's assertion, the Department may initially recommend a treatment plan and subsequently conclude that no treatment plan is appropriate. *See People in Interest of T.L.B.*, 148 P.3d 450, 455 (Colo.App.2006) (citing *People in Interest of D.C–M.S.*, 111 P.3d 559 (Colo. App.2005)).

¶ 49 Evidence presented at the termination hearing established that father had chronic mental health problems, including a mood disorder, borderline intellectual functioning, compulsive and paranoid personality traits, and histrionic and narcissistic personality features. The psychologist who evaluated father also observed that he coped with most difficulties through denial and avoidance, had a compromised ability to think abstractly or flexibly, showed poor judgment, lacked insight, and was not interested in any treatment or support services.

¶ 50 The caseworker opined that father was an unfit parent as he lacked the mental or intellectual capacity to care for the child. The psychologist also explained that father misunderstood the child's psychological needs, as he thought the child, who was a toddler, was being overly needy when he sought attention from father.

¶ 51 The record also reveals that father remained committed to mother, but did not demonstrate an understanding of her mental health problems.

¶ 52 Accordingly, the psychologist opined that there were no services that could be implemented through a treatment plan that would enable father to reunify with the child. Similarly, the caseworker testified that she was unaware of any services that could assist father with improving his condition. Finally, the visitation supervisor, who was accepted as an expert in mental health and child protection casework, testified that she was unaware of any treatment or assistance that would enable father to parent the child.

¶ 53 Under these circumstances, we conclude that the record supports the trial court's finding that no appropriate treatment plan could be devised to address father's unfitness. Accordingly, we will not disturb it on appeal. *See A.J.L.*, 243 P.3d at 250.

## VI. Reasonable Efforts When No Treatment Plan Is Possible

¶ 54 We next reject mother's and father's contentions that the Department failed to make reasonable efforts to rehabilitate them.

¶ 55 Before the court may terminate parental rights under section 19–3–604(1)(c), the state must make reasonable efforts to prevent out-of-home placement of abused and neglected children and to reunite the family. §§ 19–1–103(89), 19–3–100.5(1), 19–3–208, 19–3–604(2)(h), C.R.S.2014; *People in Interest of J.M.*, 74 P.3d 475, 477 (Colo.App.2003). Specifically, the Department must provide services that are determined necessary and appropriate by a case plan. § 19–3–208(1).

¶ 56 As discussed above, when a court determines that no treatment plan can be devised to address a parent's mental impairment, this is the equivalent of a determination that no reasonable accommodations can be made to address the parent's disabilities under the ABA.

¶ 57 Consequently, when the court proceeds under section 19–3604(1)(b) because it determines that no appropriate treatment plan can be devised to address the parent's unfitness, the Department is relieved of its obligation to provide reasonable efforts or make reasonable accommodations. *See People in Interest of A.G.*, 264 P.3d 615, 621 (Colo.App.2010) (recognizing that if the court intended to terminate parental rights under section 19–3–604(1)(c), it needed to find that the Department made reasonable efforts to reunify the family, but if it intended to terminate parental rights under section 19–3–604(1)(b)(I), it needed to find that no treatment plan could be developed for the parent), *rev'd in part on other grounds*, 262 P.3d 646 (Colo.2011).

¶ 58 Here, the court initially approved a treatment plan for mother and father. A

division of this court affirmed the dispositional order approving the treatment plan. *See People in Interest of C.Z.*, (Colo.App. No. 14CA1123, 2014 WL 5281928, Oct. 16, 2014) (not published pursuant to C.A.R. 35(f)). Thus, contrary to the caseworker's testimony that the Department did not provide referrals or services for adults, the Department was required to provide the services, including referrals for the parents, that were envisioned in the treatment plan.

¶ 59 Nonetheless, because the court ultimately terminated parental rights under section 19–3–604(1)(b), it was not required to consider whether the Department had made reasonable efforts to reunite the family.

## VII. Less Drastic Alternative and Best Interests

¶ 60 Finally, father contends that the trial court erred in finding that there was no alternative to termination and that termination was in the child's best interests. We are not persuaded.

¶ 61 The court must consider and eliminate less drastic alternatives before terminating parental rights under section 19–3–604(1)(b). *M.M.*, 726 P.2d at 1122; *People in Interest of E.I.C.*, 958 P.2d 511, 515 (Colo. App.1998). In doing so, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19–3–604(3); *People in Interest of D.P.*, 160 P.3d 351, 356 (Colo.App.2007).

¶ 62 We will not disturb a trial court's determination as to whether there is a less drastic alternative to termination when it is supported by the record. *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo.App. 2008).

¶ 63 Here, the caseworker agreed that the child needed permanency and termination was in his best interests. Additionally, the termination report, admitted into evidence at the termination hearing, established that no remedy other than termination would provide the child with the permanency that he needed.

¶ 64 Father argues that this limited evidence does not support the trial court's

finding, by clear and convincing evidence, that there was no less drastic alternative to termination. However, it is not our role to reweigh the sufficiency of the evidence on appeal. *See A.J.L.*, 243 P.3d at 256. Rather, we set aside the trial court's factual findings only when they are so clearly erroneous as to find no support in the record. *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982).

¶ 65 Accordingly, the record supports the trial court's findings that termination was in the child's best interest and there was no less drastic alternative to termination. Thus, we will not disturb them on appeal.

## VIII. Conclusion

¶ 66 The judgment is affirmed.

JUDGE GABRIEL and JUDGE BOORAS concur.