24CA1969 Peo in Interest of EN 05-01-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1969
Jefferson County District Court No. 23JV30049
Honorable Lindsay L. VanGilder, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of E.N., a Child,

and Concerning R.N.,

Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE MEIRINK
Dunn and Tow, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 1, 2025

---

Kimberly S. Sorrells, County Attorney, Claire M. Czajkowski, Assistant County Attorney, Golden, Colorado, for Appellee

Eric Truhe, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parent's Counsel, Chelsea A. Carr, Office of Respondent Parent's Counsel, Denver, Colorado, for Appellant

¶ 1 In this dependency and neglect action, R.N. (mother) appeals the judgment terminating her parent-child legal relationship with E.N. (the child). Mother contends that the juvenile court erred by finding that (1) the Jefferson County Division of Children, Youth, and Families (the Division) provided reasonable efforts to rehabilitate her; and (2) she could not become fit within a reasonable time. We disagree and affirm.

## I. Background

¶ 2 The Division received a referral in March 2023 with concerns about the then-newborn child based on mother's report that she was living in a home where methamphetamine was manufactured. The referral reported that mother was experiencing sudden changes in mood and was escalated, hostile, and violent towards hospital staff.

¶ 3 After receiving additional information that the child's umbilical cord tissue tested positive for methamphetamine, the Division filed a petition in dependency and neglect. The Division alleged concerns for mother's mental health, substance dependence, and an unsafe living environment.

1

¶ 4     The juvenile court adjudicated the child dependent and neglected. Mother's court-adopted treatment plan consisted of two objectives requiring her to complete substance abuse and mental health intakes or assessments and follow the recommendations. The court also adopted a parenting plan requiring mother to attend supervised family time with the child.

¶ 5     The Division later moved to terminate both mother's rights. In October 2024, nineteen months after the petition was filed, the juvenile court terminated mother's parental rights following a contested hearing.[1]

## II.     Reasonable Efforts

¶ 6     Mother contends that the juvenile court erred by finding that the Division made reasonable efforts because it did not adequately comply with the Americans with Disabilities Act (ADA). However, mother did not ask the juvenile court to make findings under the ADA, and, reviewing the court's reasonable efforts findings, we discern no error.

---

[1] The juvenile court found that father abandoned the child and terminated his parental rights. Father did not participate in the case and does not participate in this appeal.

2

## A. Standard of Review and Applicable Law

¶ 7 Whether a department satisfied its obligation to make reasonable efforts to reunify the family is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings related to reasonable efforts for clear error but review de novo the court's legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation. *Id.*

¶ 8 Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, the state must make reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the "exercise of diligence and care" for a child who is in out-of-home placement, and the reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208.

¶ 9 The services provided under section 19-3-208 generally must comply with the ADA and Section 504 of the Rehabilitation Act of 1973, their related amendments, and their implementing regulations. § 19-3-208(2)(g); *People in Interest of S.K.*, 2019 COA

3

36, ¶¶ 22, 25, 34; *see* 42 U.S.C. § 12102 (defining "disability" under the ADA).

¶ 10    Under the ADA no "qualified individual with a disability" shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[2] *People in Interest of C.Z.*, 2015 COA 87, ¶ 11.

¶ 11    As relevant here, a disability under the ADA requires more than a diagnosis of a mental or physical impairment.  29 C.F.R. 1630.2(j)(ii) (2024)("not every impairment will constitute a disability within the meaning of this section").  Rather, when the impairment is the basis of the disability, the ADA requires a showing that the

---

[2] A "qualified individual with a disability" is an

> individual with a disability who, with or without
> reasonable modifications to rules, policies, or
> practices, the removal of architectural,
> communication, or transportation barriers, or the
> provision of auxiliary aids and services, meets the
> essential eligibility requirements for the receipt of
> services or the participation in programs or
> activities provided by a public entity.

42 U.S.C. § 12131(2).

4

impairment "substantially limits one or more major life activities" of the individual. 42 U.S.C. § 12102(2); *See Hughes v. Colo. Dep't of Corr.*, 594 F. Supp. 2d 1226, 1239-40 (D. Colo. 2009); *RHJ Med. Ctr, Inc. v. City of DuBois*, 754 F. Supp. 2d 723, 750 (W.D. Pa. 2010) (noting that the court conducts "an individualized, fact-intensive inquiry" to determine whether an individual has a disability).

¶ 12 When a parent is found to be a qualified individual with a disability, the juvenile court must then consider whether the Department made reasonable accommodations for a parent's disability when determining whether it made reasonable efforts. *S.K.*, ¶ 34.

¶ 13 With this legal framework in mind, we turn to the circumstances of mother's claim.

## B. Additional Background

### 1. Mother's Representations About Her Visual Impairment

¶ 14 At the disposition hearing in May 2023, mother asserted that she lived with a visual impairment and received Social Security

Disability Insurance (SSDI).[3] Mother's representation changed over time, and it was unclear whether her SSDI payments were related to her vision impairment. Throughout the case, neither the Division nor the juvenile court could confirm if mother received SSDI or what, if any, disability determination had been made by the Social Security Administration.[4]

¶ 15 Mother represented that her vision fluctuated and that she was "doing better." She reported that it was difficult to get to urinalysis testing and mental health or substance dependence treatment in person and that she could not always read bus or street signs or discern changes in bus schedules. When asked how her vision impairment affected her daily life — a threshold question for determining disability under the ADA — mother responded that

---

[3] A person is legally or statutorily blind when they meet eligibility criteria set forth by the Social Security Administration. 42 U.S.C. § 416(i)(1)(B) (defining statutory blindless for SSDI eligibility).

[4] While a "record of impairment" may be used by the juvenile court to determine whether a parent is disabled under section 12102(B), a record that identifies a parent as disabled for some other purpose, such as receipt of Social Security disability benefits, does not necessarily establish the fact that a parent has a disability under the ADA. *RHJ Med. Ctr, Inc.*, 754 F. Supp. 2d at 752 (citing 29 C.F.R. 1630.2(k) (2024) defining a qualifying record of impairment).

she had "worked through a lot of it. It's just things . . . take[] a little bit longer." *See* 42 U.S.C. § 12102(2).

¶ 16    Although the Division requested ADA-specific information about mother's impairment, she provided none. Mother acknowledged that she refused to release her medical records or sign releases for her treating doctors because she did not trust the Division. After this testimony, mother signed a release for one provider, but the Division was told that mother had never been a patient. At the termination hearing in September 2024, mother testified that she didn't have access to her medical records and didn't see regular medical providers for her vision issues.

### 2.    Mother's Request for Assistance

¶ 17    At the disposition hearing, mother asked for assistance with transportation to attend substance testing. The Division assisted mother in setting up Non-Emergent Medical Transportation (NEMT), which she was able to successfully use to schedule rides.[5] Though

---

[5] Colorado NEMT is available to and from treatments covered by Medicaid, including appointments for medical, mental health, and substance dependence treatment. Dep't of Health Care Policy and Fin. 10 Code Colo. Regs. 2505-10:8.014.

NEMT was a viable transportation option for mother, she used this service only a handful of times.[6]

¶ 18    Similarly, the Division assisted mother with filling out the application for Access-a-Ride and gave her multiple copies of the form for her treating physician to complete.[7]  Mother testified that she never completed the Access-a-Ride application and that these services were never set up or used.

¶ 19    At the termination hearing, the caseworker testified that, if mother had been available for NEMT pick up or been accepted for Access-a-Ride services after completing the application, those services would have met her transportation needs.

---

[6] Mother reported that NEMT was unreliable because drivers changed and did not always come when scheduled.  The NEMT provider, however, reported that drivers attempted to pick up mother as scheduled but were unable to locate her.

[7] Access-a-Ride is the Denver-area Regional Transportation District's paratransit service required by the ADA.  49 C.F.R. 37.123(3)(2024).  Access-a-Ride services can be used for any purpose, including transportation to substance testing or family time.

### 3. Mother Did Not Ask the Juvenile Court to Make Findings or Issue Orders Under the ADA

¶ 20 At the dispositional hearing, mother asserted she would file "an ADA notification and some accommodation requests." Two months later, at the next hearing, mother's counsel told the court, "I am still trying to verify the severity of [mother's] disability so that I can file for ADA accommodations, and so I will continue to work on that piece."

¶ 21 For whatever reason, mother did not file any ADA-related motion with the court. In December 2023, the juvenile court held an evidentiary hearing on mother's motion to return the child to her care. The juvenile court declined to make findings or orders related to the ADA. The court noted "there's been talk that [mother]'s legally blind, which may or may not be true, but there's no documentation of that, no reason to know that's accurate." The court noted the Division's efforts to assist mother in obtaining services through Access-a-Ride. The court found it "interesting" that a similar lack of documentation prevented mother from verifying her eligibility for paratransit and noted, "the part that's

9

missing is that Access-a-Ride would also need medical documentation. That, for whatever reason, is not forthcoming."

### III.   Analysis

#### 1.   No Threshold ADA Findings to Review

¶ 22     Mother contends that she was a qualified individual with a disability, but she never asked the juvenile court to make findings to that effect. The record supports mother's assertion that her visual impairment was not contested by the Division. But, as we have mentioned, an impairment is not the same as a disability under the ADA. 29 C.F.R. 1630.2(j)(ii).

¶ 23     Unlike some situations considered by other divisions of this court, we cannot assume that mother's impairment was a disability under the ADA. In *C.Z.*, it was undisputed that the parents experienced mental impairments and that the impairments impeded their ability to parent the child, thereby "substantially limit[ing] one or more major life activities" of the parent. *C.Z.*, ¶ 14; *see also* 42 U.S.C. § 12102(2). In that instance, a division assumed that the impairments made the parents qualified individuals with disabilities under the ADA.

¶ 24    Here, the record is clear that both the juvenile court and the Division had questions about whether mother was a qualified individual with a disability under the ADA and, if so, what accommodations would be appropriate or necessary to give her equal access to the rehabilitative services offered by the Division. Despite having ample opportunity to place the disability issue before the juvenile court so that it could make factual findings under the ADA, mother did not.

¶ 25    Whether a parent is a qualified individual with a disability is "an individualized, fact-intensive inquiry." *RHJ Med. Ctr.*, 754 F. Supp. 2d at 751.  We will not undertake that inquiry for the first time on appeal. *Harriman v. Cabela's Inc*, 2016 COA 43, ¶ 77 ("[W]e cannot engage . . . in the necessary 'fact-intensive inquiry' because '[a]ppellate courts may not undertake fact-finding.'") (citation omitted).

¶ 26    We therefore decline to address mother's claim that she was entitled to reasonable accommodations under the ADA and limit our analysis to mother's contention that the juvenile court erred by finding that the Division made reasonable efforts.

## 2. The Division Made Reasonable Efforts

¶ 27    The juvenile court found that the Division made reasonable efforts to rehabilitate mother, which were not successful in reunifying the family. Specifically, the court found the Division

- made multiple referrals for substance treatment, mental health services, and substance testing providers;

- made reasonable efforts to support mother's participation in substance testing by providing referrals to multiple locations in an attempt to accommodate mother's schedule;

    provided supervised family time and adjusted the schedule at mother's request; and

- made reasonable efforts to provide mother with transportation, including setting up NEMT, offering gas cars and gas assistance, helped mother use audio cues on her phone to navigate the bus system, and assisting mother in completing the application for paratransit through Access-a-Ride.

The court found that, despite the Division's efforts, mother failed to reasonably comply with any objective on her treatment plan. For instance, the record shows that mother

12

- missed urinalysis screenings despite being provided with referrals to multiple providers with multiple locations;

- missed several mental health appointments and a mental health evaluation, which resulted in a provider declining to work with her;

- declined to provide information to her treating physicians to allow the Division to coordinate with mother's treatment provider; and

- missed family time sessions despite the Division's attempt to move session times to the afternoon to accommodate mother's schedule.

¶ 28 Given this evidence, we cannot conclude that the Division failed to provide reasonable efforts. Therefore, we will not disturb the juvenile court's findings and legal conclusions.

### IV. Fit in a Reasonable Period of Time

¶ 29 Mother next contends that the juvenile court erred by finding that she could not become fit in a reasonable period of time. We discern no basis for reversal.

¶ 30 An unfit parent is one whose conduct or condition renders them "unable or unwilling to give the child reasonable parental care

to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions." § 19-3-604(2). In determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 31     What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of each particular child. *Id.* at ¶ 25. When, as here, a child is under six years old at the time of the filing of the petition, the action is subject to the expedited permanency planning provisions and the court must consider the child's need to be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

¶ 32     The juvenile court determined that mother was unfit based on the unresolved underlying substance dependence concern that led to the court's involvement. While the court found that mother was attentive and cared for the child during family time, it also found

14

that mother missed "substantial amounts" of family time — about a third of all opportunities and typically for issues unrelated to transportation concerns. The court found that mother did not reengage in individual treatment until "the eve of trial" and provided the court "no information about the provider or whether the actual service she has recently engaged in is even appropriate based on the evaluation recommendations."

¶ 33 The court considered the needs of the child and found that "given the posture of this case and the extended time, [mother's fitness was] unlikely to change in a reasonable amount of time." The court found that mother was "not in any substantially different place than" when the case opened and had made little progress. The court noted that mother continued to deny any substance or mental health issues, despite testifying "about an extensive trauma history," and found that mother "did not seem interested in change." The court was concerned about mother's "lack of acknowledgement of any potential substance abuse or mental health concerns and the impact of [the child]'s prenatal substance exposure."

¶ 34    The juvenile court found that mother had already been given additional time because of complications with establishing parentage but failed to use that time to demonstrate sobriety or engage in treatment.

¶ 35    The record supports these findings.

¶ 36    The child was eighteen months old at the start of the termination hearing. The child had sensory needs and completed occupational and play therapy. The child saw a developmental specialist monthly to monitor his progress. The caseworker testified that she was concerned that mother would not let the child's professional providers "do what is needed to meet the child's needs." And, the caseworker testified, she was concerned that meeting the child's needs would be difficult while mother's own mental health remained unaddressed.

¶ 37    Mother's participation in family time was inconsistent. The facilitator for the family time program testified that mother missed about a third of her scheduled family time with the child. When mother gave reasons for cancelling, she reported illness, losing track of time, moving, and issues with transportation. The family time facilitator testified that, throughout the case, mother

frequently became emotionally dysregulated when she talked about the case, leading to concerns for the child's safety. Several family time supervisors testified that mother was attentive to the child during family time, but family time supervisors also testified that attendance was a consistent struggle for mother and that she often fixated on other parts of the case during her family time.

¶ 38 Although mother contends that she made "significant progress" on her treatment plan, the record suggests otherwise. At the time of the termination hearing, mother was living with a friend who testified that mother lived with her "most of" the case but she did not know if mother had moved out of her home. Mother provided conflicting testimony about how often she was attending individual therapy and offered no evidence concerning the treatment she was receiving. Mother denied that her treatment plan required treatment for substance dependence or mental health services.

¶ 39 The caseworker acknowledged that the child and mother responded well to each other and that it was clear that mother loved the child. But in the caseworker's opinion, ending positive interactions during family time would have minimal impact on the

child because mother was not a consistent part of the child's life. The caseworker testified that mother was unlikely to become fit within a reasonable period of time because the same concerns — mother's dysregulation, substance abuse, and lack of engagement with services — remained unaddressed. The caseworker testified that mother missed 150 required urinalysis screens and denied substance use when two screens confirmed positive for methamphetamine. Mother had not attempted to provide any urinalysis since January 2024, and the caseworker testified that she had "no clear picture" of mother's sobriety.

¶ 40 Finally, the record reveals that mother received significant additional time to establish fitness during the pendency of the case. The Division first moved for termination in November 2023, nearly a year before the final termination hearing. The Division refiled three times because of issues with determining the identity of the child's father. Despite this extra time, the uncontested evidence at the termination hearing showed that mother did not complete any urinalysis after January 2024 and did not engage in any treatment between January 2024 and August 2024.

¶ 41    Because the record supports the juvenile court's findings, we will not disturb them on appeal.

## V.    Disposition

¶ 42    The judgment is affirmed.

JUDGE DUNN and JUDGE TOW concur.