25CA1296 Peo in Interest of ETG 03-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1296
El Paso County District Court No. 24JV30001
Honorable Diana May, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of E.T.G., a Child,

and Concerning M.G-G and C.G.,

Appellants.

---

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE BERGER*
Román, C.J., and Graham*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

---

Kenny Hodges, County Attorney, Melanie Gavisk, Assistant County Attorney, Mathew Feldman, Assistant County Attorney, Colorado Springs, Colorado for Appellee

Josi McCauley, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado for Appellant M.G-G

Ainsley Baum, Office of Respondent Parents' Counsel, Denver, Colorado for Appellant C.G.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    In this dependency and neglect proceeding, M.G.-G. (mother) and C.G. (father) appeal the judgment terminating their parent-child legal relationships with E.T.G. (the child). We affirm.

## I.    Background

¶ 2    The El Paso County Department of Human Services (the Department) opened this case when the child was four months old. At that time, the family was involved in another dependency and neglect case concerning the child's siblings. Before this case opened, both parents pled guilty in criminal cases to felony child abuse resulting in serious bodily injury (SBI) to one of the child's siblings, Z.G. The juvenile court later noted that Z.G., an infant at the time of her injuries, had experienced "malnutrition and neglect."

¶ 3    In this case, the Department and mother entered a stipulation by which mother agreed to admit the child was dependent or neglected. In exchange, the Department agreed to "enter" a treatment plan for mother, instead of pursuing a theory that no appropriate treatment plan could be devised at the dispositional hearing. *See* § 19-3-508(1)(e)(I), C.R.S. 2025. Father also entered an admission, and the court adjudicated the child dependent or neglected.

1

¶ 4 The Department proposed treatment plans for both parents, and the court later adopted a treatment plan for father. But for several months, the Department and mother could not agree on an acceptable treatment plan for mother. During this period, mother's probation was revoked in her criminal case and she was sentenced to eight years in the Department of Corrections (DOC).

¶ 5 Eventually, the court adopted the treatment plan objectives proposed by the Department months prior. Not long after, the parties stipulated to nearly all aspects of the treatment plan.

¶ 6 The Department later moved for termination on the grounds that (1) no appropriate treatment plans could be devised to address the parents' unfitness, and (2) their treatment plans did not render them fit. *See* § 19-3-604(1)(b), (1)(c), C.R.S. 2025. Around this time, father was released from the DOC. At the contested termination hearing a few months later, the Department pursued only the theory of no appropriate treatment plan. *See* § 19-3-604(1)(b). A year and a half after the case opened, the court terminated the parental rights of both parents.

## II. Applicable Law and Standard of Review

¶ 7 Under limited circumstances, a juvenile court may find after adjudication that an appropriate treatment plan cannot be devised for a particular parent. § 19-3-508(1)(e)(I); *People in Interest of Z.P.S.*, 2016 COA 20, ¶ 16. One of those circumstances is when a parent is unfit based on SBI of a sibling due to proven parental abuse or neglect. §§ 19-3-508(1)(e)(I), 19-3-604(1)(b)(IV). When a court finds by clear and convincing evidence that no appropriate treatment plan can be devised based on SBI to a sibling, it may terminate a parent's rights. § 19-3-604(1)(b)(II).

¶ 8 Under specific circumstances, a court may "find that no appropriate treatment plan can be devised for a parent after it has already approved a treatment plan for the parent." *Z.P.S.*, ¶¶ 19, 28. The court may proceed to termination even when, as here, the existing dispositional order includes the provision of a treatment plan for the parent. *Id.* at ¶ 29; *see People in Interest of C.Z.*, 2015 COA 87, ¶¶ 3-5, 48.

¶ 9 When a child is under six years old, as in this case, the court must consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as

3

expeditiously as possible.  *See* §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025.

¶ 10    A juvenile court's judgment terminating parental rights presents a mixed question of fact and law involving application of the termination statute to the evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  The credibility of the witnesses and the sufficiency, probative value, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are all within the juvenile court's discretion.  *Id.*  Thus, we review the court's factual findings for clear error and will set them aside only if they lack any support in the record.  *Id.* at ¶¶ 15, 48.  But we review de novo the court's legal conclusions based on those facts.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

### III.   No Appropriate Treatment Plan

¶ 11    On various theories, both parents argue that the juvenile court erred when it found that no appropriate treatment plan could be devised to address their unfitness.  We conclude that the juvenile court did not err.

¶ 12    Both parents assert that the court failed to consider their fitness at the time of the termination hearing.  We disagree.  The

court found that the parents were unfit based on the SBI to Z.G. *See* § 19-3-604(1)(b)(IV).  Put another way, the court found that the parents were unfit at the time of the termination hearing, such that a treatment plan could not be devised to address their unfitness. *See id.*  The law permitted the court to do so, notwithstanding the fact that treatment plans were in effect at the time of the termination hearing.  *See Z.P.S.,* ¶ 29; *C.Z.,* ¶¶ 3-5, 48.

¶ 13     With respect to mother, the court took judicial notice of the fact that she pled guilty to felony child abuse resulting in SBI in violation of section 18-6-401(1)(a), (7)(a)(IV), C.R.S. 2025, in El Paso County District Court Case No. 22CR5846.  *See People v. Sa'ra,* 117 P.3d 51, 56 (Colo. App. 2004) ("A court may take judicial notice of the contents of court records in a related proceeding.").

¶ 14     A guilty plea is an admission of all the elements of a criminal charge.  *Neuhaus v. People,* 2012 CO 65, ¶ 8.  In her plea agreement, mother admitted that the crime "actually occurred" and "happened exactly as defined by the elements of the crime."  Thus, by pleading guilty, mother admitted that she had, with criminal negligence,

> caus[ed] an injury to a child's life or health, or permit[ted her] to be unreasonably placed in a situation that pose[d] a threat of injury to [her] life or health, or engage[d] in a continued pattern of conduct that result[ed] in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately result[ed] in . . . [SBI].

*See* § 18-6-401(1)(a), (7)(a)(IV). The court also took judicial notice of the fact that, nine months before the termination hearing, mother was sentenced to eight years in the DOC.

¶ 15  As to father, the court took judicial notice of the fact that he entered a guilty plea in El Paso County District Court Case No. 22CR5833. Like mother, father admitted through his plea to the elements of felony child abuse resulting in SBI to Z.G. in violation of section 18-6-401(1)(a), (7)(a)(IV). *See Neuhaus*, ¶ 8. As noted by a minute order in his criminal case, father and the prosecution stipulated to the probable cause affidavit as the factual basis for his plea. *See Sa'ra*, 117 P.3d at 56. Both the criminal and juvenile courts took judicial notice of the probable cause affidavit, which indicated that Z.G. was "listless and lethargic and . . . emaciated."

¶ 16  In addition, the court considered photographs which were admitted into evidence that depicted Z.G. when she was first

hospitalized due to her condition. Finding that they were "shocking," the court found that the pictures showed an "extremely ema[ci]ated young child" and "significant substantial child abuse." It also found that the parents had severely physically abused Z.G. Moreover, the court considered the fact that the child was four months old when this case opened and was nearly two years old at the time of its ruling. It found that, in light of Z.G.'s injuries, returning the child to the parents would amount to "putting [him] at grave risk."

¶ 17    The record supports the court's findings. A social worker from the hospital testified that Z.G. was "in the hospital for quite some time" due to her "very serious condition." After being qualified as an expert in child protection casework, the supervising caseworker opined that (1) Z.G. had experienced "severe neglect"; (2) Z.G.'s injuries raised "substantial concerns" about rehabilitating the parents within a reasonable amount of time; (3) the neglect to Z.G. raised "a concern for another child that would be so heavily dependent on their caregiver for their survival"; (4) the child was "substantially at a higher risk for still being harmed" if returned home to either parent. The caseworker also noted that the case had

been open over a year and a half, and opined that expedited permanency was important for children under six. *See* §§ 19-1-102(1.6), 19-1-123.

¶ 18  We also address, and reject, father's argument that the court improperly considered evidence that it had previously considered when it approved a treatment plan for father. He correctly points out that he had pled guilty over a year before the court adopted his treatment plan. But the court's reliance on evidence concerning Z.G.'s injuries was proper even if the court had previously considered that evidence. *See Z.P.S.*, ¶ 38 (holding that the juvenile court did not err when it modified the dispositional order by relying on evidence that "had already been considered by the court, or could have been presented to the court, at the earlier dispositional hearings").

¶ 19  Mother contends that the court was required to more explicitly "tie" the SBI to Z.G. to her unfitness at the time of the hearing. Mother cites no authority for this proposition. And, for reasons that we have set forth, namely the fact that the SBI to Z.G. was the basis for the finding of unfitness, we disagree. *See* § 19-3-604(1)(b(IV); *see also Z.P.S.*, ¶ 32 ("[T]he court's authority to modify the

dispositional order is not limited to those situations in which circumstances have changed.").

¶ 20    Nor are we persuaded by father's due process arguments.

¶ 21    Generally, procedural due process is satisfied when a parent receives notice of the proceedings, an opportunity to be heard and defend, and the assistance of counsel. *See People in Interest of E.B.*, 2022 CO 55, ¶ 16. Father claims that he was not provided notice that the Department was proceeding to termination "under *only* the theory that no [appropriate] treatment plan could be devised." (Emphasis added). But as his trial counsel conceded,

¶ 22    the Department's termination motion notified father that *one* of the grounds it intended to rely on was that no appropriate treatment plan could be devised. Because father had notice that the Department sought termination on this ground, he did not suffer a due process violation. *See id.*

¶ 23    Father also asserts that he was denied the opportunity to be heard because the court denied his motion to continue, preventing his expert witness from completing her report or testifying. But he does not explain how his expert's report or testimony would have impacted the outcome on the case and thus fails to show how he

9

was prejudiced by not presenting this evidence. *See People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007) (a parent may not obtain relief on a due process claim absent a showing of harm or prejudice).[1]

## IV. Mother's Plea Agreement Contention

¶ 24 Relying on criminal case law, mother argues that she and the Department entered into a "plea agreement," through which the Department agreed that it would "not proceed to termination under the theory of no appropriate treatment plan." She asserts that the court erred when it did not enforce the "plea agreement" or allow her to withdraw her admission when the Department did not "uphold its end" of the agreement. For a number of reasons, we reject these contentions.

## A. Additional Background

¶ 25 The parties' "plea agreement" was memorialized in a written order. The order stated that "[m]other will be entering [an

---

[1] To the extent father argues in his reply brief that the evidence on which the court relied was insufficient for it to conclude that the SBI to Z.G. was "due to *proven* parental abuse or neglect," *see* § 19-3-604(1)(b)(IV) (emphasis added), we do not address it. *See In re Marriage of Dean,* 2017 COA 51, ¶ 31 (we do not consider arguments made for the first time in a reply brief).)

10

admission with a waiver of a factual basis] on the contingency that [the Department] will enter a treatment plan rather than pursue No Reasonable Treatment Plan at the Disposition Hearing." The parties also recited the terms of their agreement during a hearing. The county attorney stated that mother's admission was "contingent upon the Department's agreement that [it] will not be filing for no reasonable treatment plan for a disposition," and that "[the Department] will be adopting a treatment plan."[2] Mother's counsel then confirmed that the county attorney accurately stated the agreement, reiterating that mother's admission was contingent on the fact that "there will be a treatment plan."

¶ 26　　More than six months before the termination hearing, the court adopted the objectives of a treatment plan for mother. While the parties never resolved a disagreement over whether she should participate in a mental health or a psychological evaluation, they agreed to all other aspects of her treatment plan five and a half months before the termination hearing.

---

[2] Only the court can enter a treatment plan. The parties may propose and submit a treatment plan, but it becomes enforceable only when the court approves it. *See* § 19-3-508(1), C.R.S. 2025.

¶ 27    At the termination hearing, mother's counsel objected to the Department pursuing termination on a theory of no appropriate treatment plan and asked to withdraw her admission. Counsel stated that mother's "understanding was that the agreement was that [the Department] would *never* pursue a finding of no reasonable treatment plan based on [mother's] previous conviction," which was "exactly what [wa]s happening now."

¶ 28    The court overruled mother's objections and permitted the Department to proceed on the theory of no appropriate treatment plan, and it did not allow mother to withdraw her admission. It concluded that, "[w]hile mother made the initial admission . . . contingent upon the Department agreeing not to proceed on no reasonable treatment plan, the Department did honor that and provide[d] a treatment plan and has since determined that there is no reasonable treatment plan at this point available."

### B.    Analysis

¶ 29    Mother relies exclusively on criminal law and cites no authority for the proposition that plea agreements are utilized in dependency and neglect cases. *See* § 16-7-301, C.R.S. 2025

(governing plea agreements); Crim. P. 11(f) (same). Nor are we aware of any such authority. On the contrary, dependency and neglect proceedings are civil in nature. C.R.J.P. 1; *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007); *see People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App. 2008) ("[A] dependency and neglect case is not a quasi-criminal proceeding . . . ."). The Rules of Civil Procedure, not the Rules of Criminal Procedure, apply in these proceedings when a procedure is not addressed in the Children's Code or the Rules of Juvenile Procedure. *See* C.R.J.P. 1; *Z.P.*, 167 P.3d at 214. Therefore, there are no plea agreements in dependency and neglect proceedings, and the Department and mother never entered into a plea agreement.

¶ 30     Nevertheless, mother asserts that the "plea agreement," or her interpretation of it, precluded the Department from relying on the no appropriate treatment plan ground at the termination hearing.

¶ 31     We first observe that under the Children's Code, the parties are precluded from stipulating to any restrictions upon the court's duty to protect the best interests of a child. *People in Interest of G.K.H.*, 698 P.2d 1386, 1387 (Colo. App. 1984) (holding that the government's stipulation with a parent not seek termination of his

parental rights "interfere[d] with the court's duty to protect the child"); *People in Interest of A.R.S.*, 502 P.2d 92, 94 (Colo. App. 1972); *see Z.P.S.*, ¶ 23 ("[T]he Children's Code is . . . designed to protect children's welfare and safety by providing procedures to serve their best interests."). Thus, there is serious doubt that the "plea agreement" conferred any enforceable rights on mother, especially with respect to the grounds for termination, and we disapprove of such agreements or stipulations. *See G.K.H.*, supra.

¶ 32　　Moreover, even if the juvenile court erred in not enforcing the alleged "plea agreement," on this record, we conclude that any error was harmless, or to the extent that the error was of a constitutional dimension, and assuming without deciding that the constitutional harmless error standard applies in dependency and neglect proceedings, constitutionally harmless. *See People in Interest of T.M.S.*, 2019 COA 136, ¶ 26 (recognizing that the Colorado Supreme Court has not addressed whether the constitutional harmless error standard applies with respect to a parent's constitutional rights in dependency and neglect cases).

## V. Father's Less Drastic Alternatives Contention

¶ 33    Father contends that the juvenile court erred by finding that no less drastic alternative to termination existed because the child's paternal grandmother was a willing and available permanent placement option for the child.

¶ 34    The juvenile court must consider and eliminate less drastic alternatives before terminating parental rights under section 19-3-604(1)(b).  *C.Z.*, ¶ 61.  In doing so, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3); *C.Z.*, ¶ 61.  For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child.  *A.M.*, ¶ 27.  Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination.  *Id.* at ¶ 32.  Under those circumstances, we must affirm the court's decision if its findings are supported by the record.  *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

¶ 35    Here, the juvenile court considered the possibility of an allocation of parental responsibilities (APR) to paternal

15

grandmother, who volunteered to be a placement around the time of the termination hearing. But it concluded that termination, rather than an APR to paternal grandmother, was in the child's best interests. *See A.M.*, ¶ 32.

¶ 36     The court found that paternal grandmother and father spent several years out of contact and reconnected shortly before the termination hearing. It also found that paternal grandmother had never met the child and that when father had custody, he did not make efforts to "have [the child] engage" with her.

¶ 37     The child was placed with three of his siblings at the time of the hearing, and the court determined it was in his best interests to remain with his siblings, as opposed to moving him to a "strange home." *See* § 19-3-500.2(1)(a) (legislative declaration recognizing that "[i]t is beneficial for a child who is removed from his or her home and placed in foster care to be able to continue relationships with his or her brothers and sisters"). The court also considered the child's young age, nearly two years old at the time of the hearing. And it found that all the child "ha[d] known" since he was four months old was his caring, stable foster placement with his siblings. *See* § 19-3-604(3); *C.Z.*, ¶ 61.

16

¶ 38    The record supports the court's findings.  Paternal grandmother testified that she had learned about the child a month before the termination hearing and reestablished contact with father around that time.  Prior to that, she had no contact with father for several years and was unaware why the Department was involved with the family.  The caseworker testified that moving the child to paternal grandmother's home would mean placing him with someone he does not know and taking him out of the home he "ha[d] been in for a while" with his siblings.

¶ 39    The child also had visits with his three other siblings who were in different placements, and the caseworker stated that there were plans for those visits to continue.  The caseworker noted that the child had been receiving occupational therapy for his sleep schedule and behaviors while in his placement.  And she testified that, while there was not yet enough information to make a final decision about placement, she preferred to keep the child in his current placement and "achieve permanency that way."  *See also People in Interest of L.M.*, 2018 COA 57M, ¶ 29 (noting that a juvenile court may consider the child's need for permanency when determining whether there is a viable less drastic alternative to termination).

¶ 40    Because the record supports the court's findings, we must affirm its determination.  *See B.H.*, ¶ 80.

                    VI.    Disposition

¶ 41    The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUDGE GRAHAM concur.