25CA0284 Peo in Interest of J-D W-L 07-10-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA0284
Mesa County District Court No. 23JV112
Honorable Matthew D. Barrett, Judge

The People of the State of Colorado,

Appellee,

In the Interest of J-D.W-L., a Child,

and Concerning M.W.,

Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHUTZ
Fox and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 10, 2025

Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

¶ 1    M.W. (mother) appeals the juvenile court's judgment terminating her parent-child legal relationship with J-D.W-L. (the child). We affirm.

## I.    Background

¶ 2    The Mesa County Department of Human Services filed a petition in dependency or neglect alleging that the child was born substance exposed.

¶ 3    After a bench trial at which mother did not appear, the juvenile court adjudicated the child dependent or neglected and adopted a treatment plan for mother. Mother's treatment plan required her to (1) attend family time and parenting classes; (2) complete a mental health and substance abuse assessment and follow all recommendations; (3) obtain stable housing and employment; (4) comply with her criminal cases and probation; (5) participate in life skills; and (6) communicate and engage with the case management team.

¶ 4    The Department subsequently moved to terminate mother's parental rights. After a contested hearing, held nearly fourteen months after the petition was filed, the juvenile court granted the termination motion.

1

## II.    Reasonable Efforts

¶ 5    Mother asserts that the juvenile court erred in finding that the Department made reasonable efforts because it failed to account for her mental health-related disabilities and failed to assist her in overcoming other obstacles that prevented her from complying with the treatment plan.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 6    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the conduct or condition of the parent is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 7    Before a juvenile court may find a parent unfit under section 19-3-604(1)(c), the department must make reasonable efforts to rehabilitate the parent and reunify the family.  §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.  "Reasonable efforts" means the "exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).  Appropriate services provided in

accordance with section 19-3-208 satisfy the reasonable efforts standard. The services that "must be available and provided" in appropriate circumstances include screening, assessments, home-based family and crisis counseling, information and referral services to assistance resources, family time, and placement services. § 19-3-208(2)(b). Additional services may be required if funding is available, including transportation, child care, diagnostic and mental health services, drug and alcohol treatment services, and family support services. § 19-3-208(2)(d).

¶ 8 Services provided under section 19-3-208 must comply with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. *People in Interest of S.K.*, 2019 COA 36, ¶¶ 25, 34; *see* 42 U.S.C. § 12102(1) (defining "disability" under the ADA); 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" under the ADA); *see also* § 19-3-208(2)(g) (requiring that services comply with the ADA). If a parent is found to be a qualified individual under the ADA, a juvenile court assessing reasonable efforts must consider whether the Department made reasonable accommodations for the parent's disability. *S.K.*, ¶ 34. Unless a parent's disability is obvious, the parent is responsible for

disclosing to the department and the juvenile court information about a disability and any modifications to the treatment plan that they believe are necessary to accommodate them. *Id.* at ¶ 21.

¶ 9 As relevant here, a disability under the ADA requires more than a diagnosis of a mental or physical impairment. 29 C.F.R. 1630.2(j)(1)(ii) (2024) ("[N]ot every impairment will constitute a disability within the meaning of this section."). Rather, the ADA requires a showing that the impairment "substantially limits one or more major life activities" of the individual. 42 U.S.C. § 12102(1)(A); *see Hughes v. Colo. Dep't of Corr.*, 594 F. Supp. 2d 1226, 1239-40 (D. Colo. 2009); *RHJ Med. Ctr., Inc. v. City of DuBois*, 754 F. Supp. 2d 723, 751 (W.D. Pa. 2010) (noting that the court conducts "an individualized, fact intensive inquiry" to determine whether an individual has a disability).

¶ 10 Whether a department satisfied its obligation to make reasonable efforts presents a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error, but we review de novo the court's legal determination based on those findings. *Id.* The juvenile court, as the trier of fact, determines the sufficiency,

probative effect, and weight of the evidence, and assesses witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## B.    Preservation

¶ 11    On appeal, the Department and guardian ad litem assert that mother's argument that the Department failed to provide reasonable accommodations under the ADA was not sufficiently raised with the juvenile court. Mother contends that she preserved this issue by raising it in closing argument at the termination hearing.

¶ 12    At least one division of this court has concluded that a parent can preserve an ADA claim by raising it for the first time in closing argument at the termination hearing. *See People in Interest of C.Z.*, 2015 COA 87, ¶ 9. *But see People in Interest of S.Z.S.*, 2022 COA 133, ¶ 17 ("[W]aiting until the termination hearing to raise the ADA issue is problematic because when the department and the juvenile court don't know that the parent has a disability, the department can't provide, and the court can't order the department to provide, reasonable accommodations to rehabilitate the parent during the case.").

¶ 13    We need not reach this issue, however, because even if we

assume, without deciding, that the ADA argument was adequately

preserved, we perceive no error.

C.    Analysis

¶ 14    Mother contends that the Department had limited contact with

her and failed to assist her with significant mental health-related

disabilities, housing, and transportation.  We are not persuaded.

¶ 15    The juvenile court found that mother "was not interested in

being involved in the case" and her noncompliance was not the

Department's fault.  The court also found that the caseworker tried

to "chase these parents down all over."  The record supports the

court's findings.

¶ 16    The first ongoing caseworker, who was assigned to the case for

over thirteen months, testified about his efforts to contact mother:

- He attempted to meet with mother at court appearances

  for this case, but she appeared virtually at the first

  shelter hearing and then did not appear again until the

  termination hearing.

- He attended court for mother's criminal cases, but

  mother failed to appear.

- He reviewed court databases and mother's criminal records to locate phone numbers and addresses for her. At one time, the caseworker was able to contact mother via phone, but there was no follow-through from mother to meet or sign paperwork.

- He sent mother Facebook messages. At times, mother responded and confirmed meetings, but then did not appear.

- When the caseworker heard mother was at a gas station, he drove there to try to locate her.

- He went to the Community Resource Center two or three times and asked staff there if they knew how to locate her. And he left business cards for staff to give to mother. Despite these efforts, the caseworker was unable to meet with mother in person until approximately ten months after the petition was filed. The caseworker testified that when he finally met with her, he offered family time services and a mental health and substance abuse assessment. He also offered to help

7

mother fill out an application for housing assistance and to submit a referral with the housing authority.

¶ 17　　The Department also provided mother with a life skills worker. The caseworker encouraged mother to engage in these services, but she was unwilling. The caseworker gave mother a release of information, which he needed to start services for her, but she refused to sign it. Mother also refused to accept a copy of her treatment plan.

¶ 18　　It is true that the caseworker did not offer mother a telephone, but the record contains no information that mother or her attorneys ever requested a telephone, and mother does not argue that providing a telephone is one of the efforts required by section 19-3-208. When mother met the caseworker in person, she did not inform the caseworker that she needed a telephone. Mother subsequently called the caseworker, stating that she changed her mind and wanted to sign releases of information to start family time. But mother again did not follow up and had no further contact with the caseworkers.

¶ 19　　Similarly, the record contains no information that mother or her attorneys ever requested transportation assistance, and

although mother's attorney made arguments about transportation at the termination hearing, mother did not raise the issue during the evidentiary portion of the hearing.

¶ 20 Throughout this case, mother did not attend family time, did not sign any releases of information, did not schedule a mental health and substance abuse assessment, called her caseworker only one time, and met with her caseworker once. Ultimately, the juvenile court found that the Department engaged in reasonable efforts, but "when you're dealing with parents who are simply not interested in participating . . . there's only so much you can do."

¶ 21 Mother next argues that the Department was aware of her mental health disabilities that *likely* qualified for accommodations under the ADA." (Emphasis added.) But mother did not file any ADA-related motion with the juvenile court, did not ask the court to make findings or issue orders under the ADA, and never moved to modify her treatment plan.

¶ 22 Mother's attorney raised the ADA for the first time at the conclusion of the termination hearing when he argued in closing that mother would "probably qualify . . . for some sort of accommodation under the ADA" because medical records showed

that she had "a seizure disorder, traumatic brain injury, high blood pressure, bipolar, [and] anxiety disorder." But mother's counsel did not identify any reasonable accommodations that would have assisted her, and she does not identify any on appeal.

¶ 23 Mother argues that the Department should have been aware of her mental health disabilities because (1) she self-reported a diagnosis of bipolar disorder in a social history for a previous case; (2) medical records related to the child's birth noted that mother suffered from bipolar disorder, seizure disorder, anxiety, and depression; and (3) there was "evidence that the seizure disorder resulted from a prior traumatic brain injury."

¶ 24 But mother presented no evidence of a traumatic brain injury. At one point, mother's attorney informed the court that mother was late returning from a break in the termination hearing because she had a seizure related to her traumatic brain injury. But mother did not testify or present evidence about a traumatic brain injury or any other mental health condition. Furthermore, mother did not participate in the intake process and provided no current information about her mental health. And the caseworker testified that nothing in mother's medical records would have changed the

treatment plan or his approach to the case. Ultimately, we agree with the Department and guardian ad litem that "[m]other's complete lack of participation prevented the Department from doing much of anything to rehabilitate her or learn about potential disabilities and necessary accommodations."

¶ 25     Finally, mother contends that the treatment plan failed to account for her disabilities and contained only "boilerplate requirements." But, as discussed above, despite the caseworker's efforts, he was unable to meet with mother when developing the treatment plan. The caseworker testified that he "would have a hard time knowing exactly what type of health or mental health issues" a parent is experiencing without having contact. And mother never signed releases of information that would have allowed the caseworker access to mental health information. Thus, the caseworker had to rely on other sources of information, such as mother's social history and criminal background.

¶ 26     When the juvenile court adopted the treatment plan, mother's attorney had not had contact with mother and took no position when asked about the proposed treatment plan. *See People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986) (the

11

appropriateness of a treatment plan must be assessed in light of the facts existing at the time of its approval).  Nor did mother ever move to amend the treatment plan.  Under these circumstances, we perceive no error in the juvenile court's finding that mother's treatment plan was appropriate.

¶ 27    Accordingly, because the record supports the juvenile court's findings, we discern no error in its conclusion that the Department made reasonable efforts.  *See A.S.L.*, ¶ 8.

### III.    Disposition

¶ 28    The judgment is affirmed.

JUDGE FOX and JUDGE HARRIS concur.