25CA0889 Peo in Interest of LT 01-08-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0889
Douglas County District Court No. 21JV199
Honorable Ben L. Leutwyler III, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of Li.T, Lu.T, and S.T., Children,

and Concerning A.T. and P.T.,

Appellants.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE HARRIS
Johnson and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

---

Jeffrey A. Garcia, County Attorney, Kathryn Cherry, Senior Assistant County Attorney, Castle Rock, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Ainsley Baum, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant A.T.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant P.T.

¶ 1    In this dependency and neglect proceeding, P.T. (father) and A.T. (mother) appeal the judgment terminating their parent-child legal relationships with Li.T, Lu.T, and S.T. (the children). We affirm.

## I.    Background

¶ 2    In January 2022, the Douglas County Department of Human Services filed a petition in dependency and neglect regarding the then-one-year-old twins and two-year-old child. The Department alleged that both parents had mental health issues — mother had previously been hospitalized and father was hospitalized at the time of the filing of the petition — and that father may have committed domestic violence against mother and the paternal grandmother, who lived with the family.

¶ 3    The juvenile court granted temporary legal custody of the children to the Department. Initially, the children were placed with two different kin providers, but six months later, they were placed in foster care, where they stayed for the remainder of the case.

¶ 4    Within the first few months of the case, father was arrested and taken into custody for violating a protection order. After a competency evaluation, the criminal court found that father was

incompetent to stand trial and ordered him to remain at the state hospital until his competency could be restored.  Father remained incarcerated until April 2023.

¶ 5    During the time father was incarcerated, the juvenile court adjudicated the children dependent or neglected.  It also adopted treatment plans for both parents.  And it granted grandmother's motion to intervene in the case.

¶ 6    After father was released from custody, he completed a psychological evaluation.  Based on the recommendations from the evaluation, the juvenile court granted father's motion to require the Department to provide him with reasonable accommodations for his learning and mental health disabilities under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213.

¶ 7    Around the same time, the court granted the Department's motion to adopt a treatment plan for grandmother.  In the following months, father and grandmother attended joint family time with the children.  By that point, mother was no longer participating in the case, and the Department considered recommending a joint allocation of parental responsibilities (APR) between father and grandmother.

¶ 8    However, after father's mental health deteriorated again, the Department moved to terminate the parents' rights. The juvenile court held a four-day contested termination hearing. At the time of the hearing, father was back in custody based on new criminal charges that he had assaulted grandmother. Mother did not appear for any portion of the termination hearing, and her whereabouts were unknown. In May 2025, more than three years after the case opened, the court issued a thorough written order terminating the parents' legal relationships with the children.

## II.    Reasonable Efforts and ADA Accommodations

¶ 9    Father contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him. According to father, the Department failed to make reasonable accommodations for his disabilities as required by the ADA. We are not persuaded.

### A.    Applicable Law and Standard of Review

¶ 10    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not

3

been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 11    To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2025. Services provided in accordance with section 19-3-208, C.R.S. 2025, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 12    Additionally, the ADA requires a public entity, such as a county department of human services, to make reasonable accommodations for qualified individuals with disabilities. *See People in Interest of C.Z.*, 2015 COA 87, ¶¶ 11-12. But the ADA does not restrict the juvenile court's authority to terminate parental rights when the parent, even on the basis of a disability, is unable to meet a child's needs. *Id.* at ¶ 17. Rather, the ADA requires that, as part of the reasonable efforts determination, the court consider

4

whether the department provided a parent with reasonable accommodations. *People in Interest of S.K.*, 2019 COA 36, ¶ 34.

¶ 13 As it relates to the ADA, the parent is responsible for disclosing information regarding his disability and identifying any modifications that he believes are necessary to accommodate the disability. *Id.* at ¶ 21. In considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concern must be the child's health and safety. *Id.* at ¶ 36. Thus, what constitutes a reasonable accommodation will vary from case to case based on the child's needs, the nature of the parent's disability, and the available resources. *Id.* at ¶ 39.

¶ 14 A parent is ultimately responsible for using the services provided by a department to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). In determining whether a department made reasonable efforts, a juvenile court should consider the totality of the circumstances and account for all services and resources provided to a parent, measuring them holistically rather than in isolation with respect to specific treatment plan objectives. *See People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶¶ 33, 35.

¶ 15    We review the juvenile court's factual findings for clear error but review de novo the court's legal determination, based on those findings, as to whether a department satisfied its reasonable efforts obligation. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

### B.    Analysis

¶ 16    The juvenile court found that the Department made reasonable efforts to rehabilitate father, which included providing reasonable accommodations for his disabilities as required by the ADA. Specifically, the court found that the Department referred father for a psychological evaluation, developed a plan for sharing information with father so that he could process it, and provided wrap-around mental health services to him. The court also found that the Department discussed the ADA accommodations with father's mental health and family time providers, who then "implemented techniques to assist [him]." The court noted that father had a social worker on his legal team who helped implement the recommended ADA accommodations.

¶ 17    The record supports the juvenile court's findings. The caseworker's supervisor testified that when father was released from custody in April 2023, the Department coordinated with the

state hospital and father's counsel to determine what services were necessary and to ensure continuity of care. At that point, father was already working with the AllHealth Network and had a medication management provider through that organization. However, instead of working with a therapist at the AllHealth Network, father asked to work with a therapist at a different organization, a request to which the Department acquiesced.

¶ 18    After some delay caused by father's refusal to sign releases of information, the Department referred father for a psychological evaluation. Thereafter, the juvenile court ordered the Department to implement the evaluations' recommendations as ADA accommodations for father's disabilities.

¶ 19    As relevant to this appeal, the psychological evaluation contained two categories of recommendations — one related to father's learning disability and another related to his mental health. First, the evaluation stated that for father to understand information, his providers needed to "dually process his emotional state as well as his comprehension of information," provide information in a low-pressure environment, and repeat information or offer breaks when father became emotionally dysregulated. To

that end, the caseworker and her supervisor testified that the Department collaborated with father's therapist and family time supervisors to ensure that they were implementing techniques to help father process information.

¶ 20 Indeed, the family time supervisor testified that to accommodate father, she and her colleagues monitored his ability to process information based on his emotional state, provided the bulk of feedback to him outside of the family time sessions, and were thoughtful about going over any written materials they gave to father. Father's therapist testified that she worked with father to regulate his emotions when he was feeling overwhelmed, repeated information, and followed up to make sure that he understood the written materials she gave him. Moreover, the caseworker's supervisor testified that the social worker from father's legal team served as a support person for father and met with him before and after meetings to make sure he understood what had been discussed.

¶ 21 Second, the psychological evaluation stated that father would "likely benefit" from intensive mental health treatment or wrap-around services and that he "may be a strong candidate" for an

8

Assertive Community Treatment (ACT) team or an intensive case manager to assist with things like keeping track of appointments and arranging transportation. To that end, the caseworker's supervisor testified that her team discussed referring father to the Douglas County Care Compact, which would have provided him with extra mental health support. However, when the caseworker spoke to father's mental health providers, they stated that they did not believe that father needed those services.

¶ 22    Indeed, at the hearing, father's therapist testified that when the Department shared the recommendations from the psychological evaluation with her, she did not believe that wrap-around services or more intensive treatment were necessary because father was "doing a really good job at accessing various services and attending his appointments." She also testified that when she initially spoke to the caseworker about ADA accommodations, she did not recommend any additional treatment outside of what father was already participating in — individual therapy with her and medication management through the AllHealth Network.

¶ 23     Nonetheless, the caseworker's supervisor testified that throughout the case, the social worker from father's legal team provided some wrap-around services because the team had requested that she do so as part of father's ADA accommodations. Moreover, the caseworker testified that when father's mental health began deteriorating, she contacted father's mental health providers to determine if father needed additional services, but at that time, they did not believe that he did. About five months later, father's medication management provider sent an email to the caseworker stating that she believed father would benefit from additional wrap-around services or an ACT program. At that point, the caseworker asked father to sign a release of information so she could refer him to those services. But father never signed the release, so the Department was unable to make those referrals.

¶ 24     We acknowledge, as father points out, that his expert witness testified that it was inappropriate for the social worker from father's legal team to provide wrap-around services. She also testified that the Department should have referred father to an ACT program or wrap-around services, as recommended in the psychological evaluation. However, as the caseworker testified, the psychological

evaluation stated that father would "likely benefit" from wrap-around services and "may be a strong candidate" for an ACT program. The record indicates that the Department relied on father's mental health providers when it determined that, at least initially, father would not benefit from or be a good candidate for those services. Then, when father's providers recommended additional services, father did not sign the releases of information that were necessary to arrange those services. Thus, we reject father's argument that the Department failed to make reasonable accommodations for him because it did not specifically refer him to wrap-around services or an ACT program.

¶ 25    Said differently, the juvenile court heard conflicting evidence about the Department's compliance with the ADA and its attempts to reasonably accommodate father's disabilities. After weighing that evidence, the court determined that the Department's efforts to accommodate father's disabilities were sufficient. And we do not reweigh the evidence or substitute our judgment for that of the juvenile court. *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

¶ 26    Accordingly, because the juvenile court's determination that the Department made reasonable efforts and provided ADA

11

accommodations is supported by the record, we discern no basis for reversal.

### III. Less Drastic Alternatives

¶ 27    Both parents contend that the juvenile court erred by finding that there were no less drastic alternatives to termination — specifically, that the court should have ordered an APR to grandmother. We discern no error.

### A. Applicable Law and Standard of Review

¶ 28    Consideration and elimination of less drastic alternatives is implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.,* 2021 CO 14, ¶ 40. In analyzing less drastic alternatives, the juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29.

¶ 29    For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. Long-term or permanent placement with a family member, short of termination, may not be in a child's best interests if it does not

provide the permanence assured by adoption or otherwise meet the child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 41.

¶ 30     "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34, *aff'd,* 2022 CO 51. Accordingly, when a juvenile court considers a less drastic alternative but instead finds that termination is in a child's best interests, we are bound to affirm the court's decision so long as the record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B.     Analysis

¶ 31     The juvenile court considered whether an APR to grandmother was a viable less drastic alternative to termination but ultimately concluded that it was not. The court found that the Department considered grandmother as a placement option throughout the case but had ongoing concerns that she lacked the ability to protect the children from father during his mental health episodes. The court found that grandmother had made "repeated statements that she would allow father to be in contact with the children even if ordered otherwise by the court." Thus, the court found that an APR to grandmother was not appropriate because she "ha[d] not

demonstrated that she [could] provide a safe and stable environment for the children."

¶ 32    The record supports the juvenile court's findings. The caseworker's supervisor testified that the Department considered grandmother as a placement option and assessed her protective capacities throughout the case. The Department created a treatment plan for grandmother and referred her to individual therapy in an attempt to help her understand how father's mental health issues created a safety risk and negatively impacted the children. Even so, the caseworker and her supervisor testified that, at the time of the termination hearing, they were still concerned about grandmother's ability and willingness to protect the children from father or provide a safe environment. They testified that their concerns were based on grandmother's repeated statements that she did not think the children were negatively affected by witnessing father's mental health episodes, and that she would not force father to leave her home or prevent him from seeing the children, even during a mental health crisis.

¶ 33    Next, grandmother's therapist testified that although grandmother acknowledged that the children may be emotionally

harmed by witnessing father's mental health episodes, she did not see the need to remove them from father during those episodes. Rather, grandmother viewed father's mental health issues as something that the children should learn to cope with and stated that she could not guarantee that she would prevent contact between father and the children, even if the court ordered her to do so.

¶ 34 Moreover, the family time supervisor testified that grandmother had stated that she did not believe father was a safety risk to the children. The supervisor testified that she never saw a shift in grandmother's understanding of how father's mental health condition negatively impacted the children or posed a safety risk to them.

¶ 35 Last, the caseworker and her supervisor, who both testified as experts in child protection, opined that an APR would not be in the children's best interests because it would not provide the permanency they needed. According to them, grandmother was not a viable APR option because of the concerns about her ability to keep the children safe, and the foster parents were not an APR

option because they were unwilling to accept an APR instead of an adoption.

¶ 36    In arguing that the juvenile court erred by finding that an APR to grandmother was not appropriate, both parents point us to evidence showing that the children were bonded to grandmother; that grandmother wanted custody of the children; and that father could not disrupt a placement with grandmother because, at the time of termination, he was incarcerated.  However, the juvenile court heard this evidence and still found that an APR to grandmother was not in the children's best interests.  The parents' argument is essentially a request that we reweigh the evidence concerning less drastic alternatives, place greater weight on the evidence of a familial bond, and override the court's contrary conclusion.  But as noted, that is not our function.  *See K.L.W.,* ¶ 62.

¶ 37    In sum, we conclude that the juvenile court properly considered and rejected an APR to grandmother based on the ongoing concerns about her ability to protect the children and the children's need for permanency.  Thus, because the record supports

the juvenile court's finding that termination was in the children's best interests, reversal is not warranted. *See B.H.*, ¶ 80.

## IV.  Disposition

¶ 38     The judgment is affirmed.

JUDGE JOHNSON and JUDGE SCHOCK concur.