25CA1405 Peo in Interest of MV 04-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1405
El Paso County District Court No. 23JV6
Honorable Lin Billings Vela, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of M.V., a Child,

and Concerning T.A.V. and M.V.,

Appellants.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Lum and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

---

Kenneth R. Hodges, County Attorney, Amy C. Fitch, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant T.A.V.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant M.V.

¶ 1    In this dependency and neglect proceeding, M.V. (father) and T.A.V. (mother) appeal the judgment terminating their parent-child legal relationships with M.V., Jr. (the child).  We affirm.

## I.    Background

¶ 2    The El Paso County Department of Human Services filed a petition in dependency and neglect, alleging that (1) the child tested positive for substances at birth and showed signs of withdrawal; (2) mother refused medical treatment for the child; and (3) mother tested positive for methamphetamine while pregnant.

¶ 3    Initially, the child was placed with two different "kin-like" providers and then a foster family, but nearly a year before the termination hearing, the Department placed the child with his maternal half-sister (sister) in Texas through the Interstate Compact on the Placement of Children (ICPC).  She subsequently moved to Florida with the child after another ICPC was approved.

¶ 4    Father admitted the allegations in the petition, and the juvenile court adjudicated the child dependent and neglected with respect to father.  Three months later, after an adjudicatory bench trial, the court adjudicated the child dependent and neglected with respect to mother.  In mid-2023, the court adopted similar

1

treatment plans for both parents, requiring them to (1) participate in substance abuse evaluations, follow treatment recommendations, and submit to sobriety monitoring; (2) develop parenting skills sufficient to meet the child's needs; (3) engage in family time; and (4) ensure a safe and stable home environment for the child.

¶ 5    The Department then moved to terminate both parents' parental rights in March 2025.  Nearly two and a half years after the petition was filed, the juvenile court terminated both parents' parental rights following a contested hearing.

¶ 6    Father and mother both appeal the termination judgment.

## II.    Termination Criteria and Standard of Review

¶ 7    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent hasn't reasonably complied with an appropriate treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 8    Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves

application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn from the evidence are within the juvenile court's province. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### III.  Reasonable Accommodations

¶ 9      Father contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him because it failed to provide reasonable accommodations for his traumatic brain injury (TBI), as required by the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. We aren't persuaded.

### A.  Applicable Law

¶ 10    The ADA requires the juvenile court and the Department to account, and make reasonable accommodations, for a parent's disability when devising a treatment plan and providing

rehabilitative services. *People in Interest of S.K.*, 2019 COA 36, ¶ 34; *see also* 42 U.S.C. § 12102(1)(A) (defining "disability" under the ADA as "a physical or mental impairment that substantially limits one or more major life activities"). But the ADA doesn't restrict the juvenile court's authority to terminate parental rights if a parent, even because of a disability, isn't able to meet a child's needs. *People in Interest of C.Z.*, 2015 COA 87, ¶ 17. Rather, before terminating parental rights under section 19-3-604(1)(c), the ADA requires the juvenile court to consider whether reasonable accommodations were provided when determining the appropriateness of a parent's treatment plan and whether a department made reasonable efforts to rehabilitate the parent. *S.K.*, ¶ 34. The services provided under section 19-3-208, C.R.S. 2025, must comply with the ADA. *Id.* at ¶¶ 25, 34; § 19-3-208(2)(g). When a parent is found to be a qualified individual with a disability under the ADA, an assessment of whether the department made reasonable efforts includes consideration of whether it made reasonable accommodations for the parent's disability. *S.K.*, ¶ 34.

¶ 11 Whether a parent is a qualified individual with a disability under the ADA requires a case-by-case determination. *Id.* at ¶ 21.

Before a department can be required to provide reasonable accommodations under the ADA, it must be made aware that the person is a qualified individual with a disability. *Id.* at ¶ 22. Thus, while a department must provide appropriate screening and assessments of a parent, the parent is responsible for disclosing information regarding his disability. *Id.* at ¶ 21. And a parent should also identify any modifications that he believes are necessary to accommodate the disability. *Id.*

¶ 12 In considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concern must always be the child's health and safety. *Id.* at ¶ 36. Thus, what qualifies as a reasonable accommodation will vary from case to case based on the child's needs, the nature of the parent's disability, and the department's available resources. *Id.* at ¶ 39.

## B. Additional Background

¶ 13 Father objected to the Department's first proposed treatment plan and filed a Motion for Accommodations Pursuant to ADA, informing the court and the Department of his qualifying disability. As accommodations, father requested (1) referrals to professionals experienced in working with adults with TBI; (2) that he not be

5

required to submit to multiple or duplicative assessments, therapy, testing, or other treatment requirements; (3) direct support from a well-qualified life skills counselor experienced with TBI clients; and (4) face-to-face and hands-on instruction "with opportunity for repetition and practice."

¶ 14 The Department then filed the revised treatment plan which incorporated father's requested accommodations. Father's counsel didn't contest the revised treatment plan and told the juvenile court that she would file a motion if father needed additional accommodations. Father's counsel later confirmed that father had no objections to the amended treatment plan and noted that "the treatment providers or evaluators need to know what the circumstances are and make determinations on what accommodations are available or necessary." The record contains no further requests from father for accommodations or to modify the treatment plan. *See id.* at ¶ 21 (a parent should identify any modifications he believes are necessary to accommodate his disability).

## C. Analysis

¶ 15 Father argues that "nothing was provided" to help him overcome his disabilities and comply with the treatment plan. The juvenile court found that the Department made reasonable efforts, including making a referral for trauma-informed treatment. But the court found that father never went to any of the treatment providers, so there was no opportunity for them to assess father's needs. The court concluded that father's failure to complete the treatment plan wasn't a result of his TBI or lack of accommodations.

¶ 16 The record supports the court's findings. When the caseworker was asked whether she provided "repetition, [] practice, and [] face-to-face instruction to [father]," she testified that "a lot of [her] stuff with him was face-to-face." The caseworker testified that when she asked father about treatment, he declined treatment services. The caseworker explained that when she tried to engage father, "[h]is continuous thing . . . was that due to his TBI he would not be completing any treatment or do any [urinalysis tests (UAs)]." Father's reason for not engaging in treatment or submitting UAs was his belief that his medications would cause positive UAs. The

caseworker assured father that if he showed his prescriptions to the testing centers, they would inform the Department if any of his medications could cause a positive test. But father didn't provide a list of his prescriptions to the Department or treatment providers.

¶ 17 The caseworker testified that the Department nonetheless referred father to two different treatment providers, but both referrals were closed for lack of engagement. The caseworker explained that father never completed an intake with either provider "in order to have that face-to-face contact."

¶ 18 Father next asserts that the Department moved the child out of state, which foreclosed in-person family time. But the juvenile court took judicial notice of a prior hearing at which father himself told the court that he didn't object to the child's placement in Texas. *See People in Interest of M.S.*, 129 P.3d 1086, 1087 (Colo. App. 2005) ("When a party acquiesces in the court's error, he or she is precluded from challenging the issue on appeal."). The caseworker testified that after the child moved to Florida, the Department offered father an opportunity to travel for in-person family time, but he declined.

¶ 19    Accordingly, because the record supports the juvenile court's findings, we discern no error in its conclusion that the Department made reasonable efforts and provided ADA accommodations.

## IV.    Fitness Within a Reasonable Time

¶ 20    Mother contends that she substantially complied with her treatment plan, and, if given additional time, she could have been sufficiently rehabilitated.  We conclude that the record supports the juvenile court's contrary findings.

### A.    Applicable Law

¶ 21    A parent is unfit if her conduct or condition renders her unable or unwilling to give her child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 22    When deciding whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the

parent's conduct or condition. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24. Partial or even substantial compliance with a treatment plan "may not be sufficient to correct or improve the parent's conduct or condition." *A.J.*, 143 P.3d at 1151.

¶ 23     What constitutes a reasonable time is fact-specific and must be determined by considering the physical, mental, and emotional conditions and needs of each particular child. *S.Z.S.*, ¶ 25. A reasonable time isn't an indefinite time. *Id.* And even when a parent has made recent progress on a treatment plan, the court isn't required to give the parent additional time to comply. *See id.* at ¶¶ 24-25.

¶ 24     When, as in this case, a child is under six years old, the juvenile court must also consider the expedited permanency planning (EPP) provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025. In EPP cases, no parent shall be found to be in reasonable compliance with, or have been successful at, a treatment plan when the parent exhibits the same problems addressed in the treatment plan without adequate improvement. § 19-3-604(1)(c)(I).

## B.    Analysis

¶ 25    Mother points to her progress on some of the treatment plan's components, including her engagement in family time and providing safe and stable housing.  The juvenile court acknowledged that mother substantially complied with parts of her treatment plan.  But the court found that mother didn't comply with the substance abuse component — which the court deemed "the most significant objective" — or with the requirement that she develop parental protective capacity.  Thus, it concluded that mother didn't successfully complete her treatment plan and that she remained unfit.

¶ 26    The record supports the court's findings as well as its ultimate conclusion on fitness.  The caseworker testified that mother used a substance use treatment provider that didn't contract with the Department and that she didn't sign releases of information, so the caseworker wasn't able to access mother's treatment records.  The caseworker testified that mother hadn't completed UAs "consistently or recently", and that mother's last UA, submitted nine months before the termination hearing, tested positive for fentanyl.  Mother's only hair follicle test, submitted early in the

case, tested positive for methamphetamine. The caseworker testified that even when mother submitted UAs, the testing facility suspected that mother used "fake or false urine" because "creatine levels, pH levels and temperature weren't normal." The caseworker concluded that mother did not comply with the substance abuse component of her treatment plan. *See People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005) (noting that unfitness may be premised on a parent's failure to document sobriety).

¶ 27    The caseworker, an expert in child protection and child welfare, also opined that mother didn't develop protective parenting capacity. The caseworker testified that mother refused to participate in parenting classes and that mother hadn't "been able to internalize and understand the impact and consequences of her behavior on [the child]." For example, mother told the caseworker that the child wasn't born positive for a substance, but that the hospital drugged the child after his birth. The family time supervisor testified that during one video visit with the child, mother was in her car, and the supervisor saw someone hand her a "crack pipe."

¶ 28    Mother argues that, if given additional time, she could show compliance with the substance abuse objective of her treatment plan. The juvenile court noted that the case had been open "well past [the] EPP guidelines," considered the child's specific needs, and found that the child needed permanency. The court concluded that it wasn't in the child's best interest to wait any longer for mother to complete her treatment plan.

¶ 29    The record supports the court's findings. The caseworker opined that mother's conduct or condition was unlikely to change within a reasonable time because there hadn't been a lot of progress in the two and a half years the case had been open. With respect to the child's mental and emotional needs, the caseworker testified that the child had special needs, and sister testified that she took the child to various therapy services three times per week. The caseworker testified that the child was "so young" and needed permanency. Thus, she opined that termination best served the child's physical, mental, and emotional needs and conditions.

¶ 30    Based on this evidence, we conclude that the juvenile court didn't err by concluding that mother was unfit and by declining to give her more time. *See S.Z.S.*, ¶¶ 24, 28-29 (the court need not

give a parent additional time, even where there has been recent progress on the treatment plan).

## V.    Less Drastic Alternative

¶ 31    Both parents contend that the juvenile court erred by finding that there was no less drastic alternative to termination — specifically, that the court should have ordered an allocation of parental responsibilities (APR) to sister.  We don't agree.

## A.    Applicable Law

¶ 32    Implicit in the statutory criteria for termination is the requirement that the juvenile court consider and eliminate less drastic alternatives.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 24.  When considering less drastic alternatives, the court must base its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).

¶ 33    For a less drastic alternative to be viable, it must be the "best" option for the child.  *A.M.*, ¶ 27.  For that reason, if the court considers a less drastic alternative but finds that termination is in the child's best interest, it must reject the less drastic alternative and order termination.  *Id.* at ¶ 32.  We are bound by that

14

determination if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

### B. Analysis

¶ 34 The juvenile court considered whether an APR to sister was a viable less drastic alternative to termination but ultimately concluded, with record support, that it wasn't.

¶ 35 Sister testified that the child needed "a permanent spot . . . to grow up well." And the caseworker testified that the child "deserves [a] permanent, stable home . . ." The caseworker discussed the possibility of an APR with sister, but sister nonetheless testified that she preferred adoption. *See People in Interest of Z.M.*, 2020 COA 3M, ¶ 31 (a juvenile court may consider the placement's preference for adoption over an APR).

¶ 36 Ultimately, the caseworker opined that there was no less drastic alternative to termination that was in the child's best interest. The caseworker also opined that termination best served the child's physical, mental, and emotional needs and conditions.

¶ 37 The juvenile court properly considered and rejected an APR to sister based on her stated preference for adoption and the child's need for permanency. We therefore decline to disturb the juvenile

court's conclusion that there was no less drastic alternative to termination.

## VI. Disposition

¶ 38 We affirm the judgment.

JUDGE LUM and JUDGE MEIRINK concur.