25CA1469 Peo in Interest of BR 04-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1469
Arapahoe County District Court No. 19JV898
Honorable Shay Whitaker, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of B.R. and A.R., Children,

and

Concerning C.R.,

Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE LUM
J. Jones and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

---

Ron Carl, County Attorney, Writer Mott, Deputy County Attorney, Rebecca M. Taylor, Senior Assistant County Attorney, Jordan Lewis, Assistant County Attorney, Littleton, Colorado; Tamra White, Assistant County Attorney, Aurora, Colorado, for Appellee

Sheena Knight, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

¶ 1 In this dependency and neglect proceeding, C.R. (mother) appeals the judgment terminating her parent-child legal relationships with B.R. and A.R. (the children). We affirm.

## I. Background

¶ 2 In November 2019, the Arapahoe County Department of Human Services (the Department) received a referral alleging that mother had threatened the children's lives. The Department sought, and the court granted, temporary custody of the children for placement in foster care. The Department then filed a petition in dependency or neglect based on concerns of physical abuse and mother's mental health.

¶ 3 Two months later, the juvenile court adjudicated the children dependent and neglected and adopted a treatment plan for mother. Among other things, mother's treatment plan required her to (1) complete a neuropsychological evaluation and follow all treatment recommendations; (2) provide a safe and stable residence for the children; (3) maintain income sufficient to meet the children's needs and budget to meet financial obligations; (4) attend family time; (5) complete a mental health evaluation and follow all

1

treatment recommendations; and (6) participate in in-home parenting education.

¶ 4    A few months later, mother completed a neuropsychological evaluation resulting in a diagnosis of adjustment disorder with depressed mood and a provisional diagnosis of mild intellectual development disorder.  Mother did not request any accommodations or modifications to her treatment plan related to those diagnoses at that time.

¶ 5    The Department then moved to terminate mother's parental rights.  Fourteen months after the filing of the petition, the juvenile court terminated mother's legal relationships with the children.  Mother appealed, and a division of this court remanded the case for the limited purpose of considering a C.R.C.P. 60(b) motion regarding the public censure of the judicial officer who presided over the termination hearing.  Following the parties' stipulation, the juvenile court vacated the termination judgment.

¶ 6    The Department filed a subsequent motion to terminate mother's parental rights, which the juvenile court denied in order to give mother additional time to work on her treatment plan.  The juvenile court then adopted an amended treatment plan for mother,

which removed the prior neuropsychological evaluation and family time objectives and added an objective to complete reintegration therapy with the children.

¶ 7    Four months later, in July 2023, mother's counsel filed a notice asserting that the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, applied to mother based on the diagnoses from her neuropsychological evaluation.  The juvenile court granted mother's motion to require the Department to provide her with reasonable accommodations for her disability, including (1) communicating in clear, basic language; (2) relaying information frequently, in different mediums, and at a lower reading level; (3) supplying printed copies of all important documents or reports; (4) providing hands-on parenting education; (5) texting appointment reminders before all non-regular appointments; and (6) allowing mother's guardian ad litem, advocate, or attorney to participate in all meetings.

¶ 8    In February 2024, mother's counsel filed an adaptive parenting assessment completed by her retained expert, which recommended additional accommodations to allow mother "to learn and demonstrate skills necessary for adequate parenting."  Mother

did not request additional court-ordered accommodations based on this evaluation. But mother, the children's guardian ad litem, and the Department agreed to an amended treatment plan, which the juvenile court adopted, requiring mother to engage in therapeutic family time instead of reintegration therapy, supportive services through a community center board program, life skills, and parenting education, in addition to her previous treatment plan objectives. For certain objectives, the amended treatment plan also detailed accommodations that the Department agreed to provide mother to assist her in completing the particular objective.

¶ 9 Shortly thereafter, the Department again moved to terminate mother's parental rights. After a fourteen-day hearing spanning seven months, the juvenile court terminated mother's parental rights.

## II. Statutory Criteria and Standard of Review

¶ 10 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct

4

or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 11 The question of whether a juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the juvenile court's findings of evidentiary fact for clear error and accept them if they have record support. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But determining the proper legal standard to apply in a case and applying that standard to the particular facts of the case are questions of law that we review de novo. *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31. The credibility of witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the juvenile court's province. *A.M.*, ¶ 15.

### III. Reasonable Efforts and ADA Accommodations

¶ 12 Mother contends that the juvenile court erred by finding that the Department made reasonable efforts to reunify the family because the Department failed to make reasonable accommodations for her disability as required by the ADA. We are not persuaded.

5

## A. Applicable Law

¶ 13    In deciding whether to terminate parental rights under section 19-3-604(1)(c), the juvenile court must consider whether the county department of human services made reasonable efforts to rehabilitate the parent and reunite the family.  §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2025.  "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement.  § 19-1-103(114).  Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).

¶ 14    Additionally, the ADA requires a public entity, such as a county department of human services, to make reasonable accommodations for qualified individuals with disabilities.  *See People in Interest of C.Z.*, 2015 COA 87, ¶¶ 11-12.  But the ADA does not restrict the juvenile court's authority to terminate parental rights when the parent, even on the basis of a disability, is unable to meet a child's needs.  *Id.* at ¶ 17.  Rather, the ADA requires that, as part of the reasonable efforts determination, the court consider whether the department provided a parent with reasonable accommodations.  *People in Interest of S.K.*, 2019 COA 36, ¶ 34.

¶ 15    Whether a parent is a qualified individual with a disability under the ADA requires a case-by-case determination. *Id.* at ¶ 21. Before a department can be required to provide reasonable accommodations under the ADA, it must know that the individual has a qualifying disability, either because that disability is obvious or because someone has informed the department of the disability. *Id.* at ¶ 22. Thus, while a department must provide appropriate screenings and assessments of a parent, the parent is responsible for disclosing information regarding her disability. *Id.* at ¶ 21. And a parent should also identify any modifications that she believes are necessary to accommodate her disability. *Id.*

¶ 16    In considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concerns must always be the children's health and safety. *Id.* at ¶ 36. Thus, what constitutes a reasonable accommodation will vary from case to case based on the children's needs, the nature of the parent's disability, and the available resources. *Id.* at ¶ 39.

¶ 17    A parent is ultimately responsible for using the services provided by a department to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279,

7

1284 (Colo. App. 2011). In determining whether a department made reasonable efforts, a juvenile court should consider the totality of the circumstances and account for all services and resources provided to a parent, measuring them holistically rather than in isolation with respect to specific treatment plan objectives. *See People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶¶ 33, 35.

## B. Analysis

¶ 18    The juvenile court concluded that the Department made reasonable efforts and provided reasonable accommodations for mother's disability as required by the ADA, including referrals for treatment, treatment plan amendments, the use of written communication, and the creation of a checklist for mother's use.

¶ 19    The record supports the juvenile court's findings. Mother's first ongoing caseworker testified that she referred mother to the community center board program for Arapahoe County and the hands-on parenting education (HOPE) initiative. The HOPE initiative works specifically with individuals with disabilities to provide parenting education and can also help a parent apply for jobs, sign leases, create budgets, and build safety in their home. In addition, the caseworker engaged in meetings with mother's

support team, checked in frequently, and communicated with mother in a variety of formats — such as text messages followed by clarification phone calls and written materials followed by in-person reviews.

¶ 20 The second ongoing caseworker also described the accommodations she made for mother, including (1) providing a simplified treatment plan to mother; (2) creating a checklist for the first treatment plan objective as recommended by mother's expert; (3) using clear, simple, and plain language; (4) providing written copies of documents; (5) allowing mother's legal team to be present during home visits and conversations with the Department; (6) providing reminders for non-regularly scheduled appointments; (7) repeatedly relaying important information to mother in a variety of ways and at a lower reading level; (8) referring mother to service providers for hands-on parenting education; and (9) informing mother's service providers about her disability and necessary accommodations.

¶ 21 Several of mother's service providers — including her therapist, HOPE initiative coach, and therapeutic family time supervisor — confirmed that the Department informed them of

mother's disability and associated accommodations, including using simplified language, repeatedly discussing important information, and providing appointment reminders. Mother's HOPE initiative coach also went through the simplified treatment plan and the court-ordered treatment plan with mother, helped her with the vocabulary, connected higher-level words to lower-level synonyms, and used the teach-back method to confirm mother's understanding of the plan.

¶ 22    Nevertheless, mother asserts that the Department failed to accommodate her disability by not (1) providing her with a simple and accessible treatment plan including clear objectives and measurable goals; (2) using plain language; (3) referring her to treatment providers well-versed in working with individuals with developmental disabilities; and (4) liberalizing her family time to home and community environments.[1]

---

[1] While mother asserts that the Department "admittedly" failed to provide these recommended accommodations, she provides no record cites to support this contention. And we do not see any such admission in the record. *See Cikraji v. Snowberger*, 2015 COA 66, ¶ 10 (an appellate court is not required to "comb the record" for facts supporting a party's argument that are not cited in the briefs).

10

¶ 23    But, as detailed above, the record shows that the Department provided mother with the first three accommodations.  True, due to instability in mother's housing and concerns about the emotional impact on the children, family time did not expand to visits in mother's home.  *See S.K.*, ¶ 36.  But mother's family time increased in duration, expanded to community visits, and provided hands-on opportunities for her to practice her parenting skills.  And yet, mother often chose to exercise her family time in the supervision facility offices.  *See J.C.R.*, 259 P.3d at 1285.

¶ 24    Next, mother asserts that she required "a strong and trusting relationship with her treatment providers."  The Department provided mother with referrals to mental health therapists, hands-on parenting and life-skills coaches, a therapeutic family time supervisor, and endeavored to connect her to the community center board program.  Even so, mother's inconsistent engagement with her treatment providers, emotional dysregulation during meetings, and vacillating positions on her willingness to work with various providers impacted her relationship with the providers.  The second ongoing caseworker testified that mother's communication style during periods of emotional dysregulation, including yelling,

cursing, and ending phone calls prematurely, made it difficult for service providers to work with her. Even assuming that mother's struggle to emotionally regulate herself was a symptom of her disability, mother admitted that her prescribed mental health medication helped. But mother did not consistently take her medication or engage in mental health treatment and refused reminders to do so, often becoming escalated if a provider gave her reminders. *See id.* At the time of the termination order, mother had not been consistently involved in therapy for at least eight months and reported she had not been taking her medication. Mother does not explain what other accommodations the Department could have provided to help her establish relationships with her treatment providers. *See S.K.*, ¶ 21.

¶ 25 Last, mother asserts that she "required inclusion into the children's educational and therapeutic decisions." But mother does not explain how this would have accommodated her disability. *See id.* at ¶ 34 ("[W]hen a parent involved in a dependency and neglect proceeding has a disability under the ADA, the Department and the juvenile court must account for and, if possible, make reasonable accommodations *for the parent's disability* when devising a

12

treatment plan and providing rehabilitative services to the parent.")
(emphasis added). Moreover, mother does not explain what
educational or therapeutic decisions were made during the case or
how her involvement in such decisions would have affected the
outcome of the case. *See* C.A.R. 35(c) (we may disregard any error
not affecting a party's substantial rights); *People in Interest of R.J.*,
2019 COA 109, ¶ 22 (an error affects a substantial right if it can be
said with fair assurance that it substantially influenced the case's
outcome or impaired the basic fairness of the proceeding). Instead,
mother's argument focuses largely on the testimony of her retained
expert, including her recommended accommodations. But the
court considered this evidence and still concluded that the
Department made reasonable efforts and accommodated mother's
disability. And we cannot reweigh the evidence or substitute our
judgment for that of the juvenile court. *People in Interest of S.Z.S.*,
2022 COA 133, ¶ 29.

¶ 26    In sum, because the juvenile court's determination that the
Department made reasonable efforts and provided ADA
accommodations for mother is supported by the record, we discern
no basis for reversal.

## IV. Fitness Within a Reasonable Time

¶ 27 Mother argues that the juvenile court erred by finding that she could not become a fit parent within a reasonable amount of time. We disagree.

## A. Applicable Law

¶ 28 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *S.K.*, ¶ 74. Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental needs and conditions. *Id.*

¶ 29 In determining whether a parent's conduct or condition is likely to change within a reasonable time, the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *Id.* at ¶ 75. When a parent has made little to no progress on a treatment plan, the juvenile court need not give the parent additional time to comply. *See People in Interest of A.N-B.*, 2019 COA 46, ¶¶ 37-38.

¶ 30    A reasonable time is not an indefinite time, and it must be determined by considering the children's physical, mental, and emotional conditions and needs. *Id.* at ¶ 34. What constitutes a reasonable time is fact specific and varies from case to case. *Id.* at ¶ 40. However, where, as here, the child is under the age of six years old, the court must also consider the expedited permanency planning (EPP) provisions, which require the court to place the child in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025.

B.    Analysis

¶ 31    The juvenile court found that mother was unfit, had not reasonably complied with her court-ordered treatment plan, and exhibited the same problems addressed in her treatment plan without adequate improvement, and that her conduct or condition was unlikely to change within a reasonable time.

¶ 32    The record supports the court's findings. The second ongoing caseworker testified that, despite the nearly six-year duration of the case, mother had not demonstrated sustained progress on any of the treatment plan objectives. She acknowledged that mother received disability income and had a housing voucher, which

15

provided some rental assistance. But due to mother's demonstrated inability throughout the case to develop and follow a budget to consistently manage and pay her bills, the caseworker expressed concern about mother's ability to pay her portion of the rent and utilities even with the voucher.

¶ 33    Moreover, as detailed above, the caseworker described mother's lack of consistent and recent mental health treatment and opined that mother did not "take the mental health piece of this case seriously." And while mother consistently attended family time, it continued to be therapeutically supervised due to ongoing concerns about mother's inability to refrain from discussing adult topics with the children, remain emotionally regulated during family time, and consistently accept and implement feedback from the supervisor.

¶ 34    The case was opened, in part, due to concerns with mother's emotional dysregulation and anger, and these concerns remained at the time of the termination. In addition to the outbursts detailed above toward the caseworkers and treatment providers, the children's foster mother described a family time visit, about five months before the termination order, that ended with mother

driving erratically through the parking lot while "screaming" and "cussing" at her in front of the children. Overall, the caseworker acknowledged that while mother had been "partially compliant" with some of the treatment plan objectives, she had not been "successful" or "shown sustained behavioral changes or . . . that she ha[d] the skills necessary to provide stability" for the children.

¶ 35 Above all, the caseworker testified that, considering the children's overall emotional and mental health, she did not believe it was appropriate for them to have to wait any longer because the EPP case had been open for nearly six years and the children needed immediate permanency. *See A.N-B.*, ¶ 34.

¶ 36 Even so, mother argues that because she "engaged with every aspect of [her] treatment plan" and made "consistent, significant changes" the juvenile court erred by finding that she could not become fit within a reasonable time. The court acknowledged mother's efforts to engage in her treatment plan, and "progress at times throughout this case," before ultimately finding that mother had not made sufficient progress to mitigate the concerns that led to the Department's involvement. And, considering mother's minimal progress during the six-year-long case, the court found

17

that mother was unlikely to become fit within a reasonable time. Mother essentially asks us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do. *S.Z.S.*, ¶ 29.

¶ 37 Mother also asserts that with an appropriate treatment plan, incorporating the accommodations recommended by her retained expert, she would be capable of reunifying with the children in a short period of time. We decline to address that assertion again as we have addressed it in-depth above.

¶ 38 In sum, because the juvenile court's findings are supported by the record, we discern no error.

## V. Disposition

¶ 39 The judgment is affirmed.

JUDGE J. JONES and JUDGE MEIRINK concur.